**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **Receivership Management, Inc. in its capacity as the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan and Participating Plans,** | |
| **Plaintiff,** | **Case No. 1:19-cv-01385** |
| **v.** | **JURY DEMAND** |
| **A.J. Corso & Associates, Inc., and Anthony J. Corso, individually; American Benefits Association, Inc.; America's Back Office; Americas Health Care Alliance, Inc.; Assurance Agency, Ltd.; BB&G, Ltd.; Commercial Group Intermediaries, Inc.; Employers Network Association, Inc., d/b/a Louis Deluca and Affiliates; Employers Innovative Network, LLC, and Jeff Mullins, individually; Ferrell Insurance Agency, Inc.; Financial Security Consultants, Inc., and Patrick Keenan, individually; GCG Risk Management Consultants, LLC, d/b/a Flagship Healthcare, and Mark Krogulski, individually; The HFA Plan; Health Care Reform Benefit Solutions, Inc., d/b/a HRB Solutions Inc., and Catherine Sbarra, individually; Hub International Midwest Limited; M. Brown & Associates Ltd., and Mark Brown, individually; Madison Street Group, LLC; MGU of the West Insurance Services, Inc., d/b/a OneSource StopLoss Insurance; Trendsetters & Associates, Inc.; Williams-Manny, Inc., d/b/a Gallagher Williams-Manny Insurance Group; Youngs Management Company, LLC;** | **<u>COMPLAINT</u>** |
| **Defendants.** | |

This case is about the improper acts and omissions of the persons and entities who marketed and sold the failed health benefits plan named the AEU Holdings, LLC Employee Benefit Plan ("AEU Plan"). Plaintiff Receivership Management, Inc. is the court-appointed Independent Fiduciary of the AEU Plan and Participating Plans ("Independent Fiduciary") and in that capacity brings the following claims against Defendants. In support thereof, the Independent Fiduciary alleges as follows.

**PARTIES**

1. Plaintiff Receivership Management, Inc. is a Tennessee corporation with its principal place of business in Nashville, Tennessee. Receivership Management, Inc. was appointed as Independent Fiduciary by the court in the pending case *Acosta v. AEU Benefits, LLC, et al.*, U.S. District Court for the Northern District of Illinois Case Number 1:17-cv-07931-JHL-SMF.

2. On information and belief, Defendant A.J. Corso & Associates, Inc., is an Illinois corporation with its principal place of business located at 2041 Trevino Terrace, Vernon Hills, Illinois 60061-4540.

3. On information and belief, Defendant Anthony J. Corso is an Illinois resident and citizen who can be served with process at 2041 Trevino Terrace, Vernon Hills, Illinois 60061-4540.

4. On information and belief, Defendant American Benefits Association, Inc., is a New Jersey corporation with its principal place of business located at 199 South Black Horse Pike, Blackwood, New Jersey 08012.

5. On information and belief, Defendant America's Back Office is an unincorporated Michigan entity with its principal place of business located at 13900 Lakeside

Circle, Suite 200, Sterling Heights, Michigan 48313. On information and belief, none of its proprietors are residents or citizens of the State of Tennessee.

6. On information and belief, Defendant Americas Health Care Alliance, Inc., is an Ohio corporation with its principal place of business located at 129 Lake Terrace Drive, Munroe Falls, Ohio 44262.

7. On information and belief, Defendant Assurance Agency, Ltd., is an Illinois corporation with its principal place of business located at 1750 E Golf Rd, Schaumburg, Illinois 60173.

8. On information and belief, Defendant BB&G, Ltd., is an Illinois limited partnership with its principal place of business located at 5750 Old Orchard Road, Suite 350, Skokie, Illinois 60077. On information and belief, none of its partners are residents or citizens of the State of Tennessee.

9. On information and belief, Defendant Commercial Group Intermediaries, Inc., is an Illinois corporation with its principal place of business located at 16 Executive Court, Suite 4, South Barrington, Illinois 60010.

10. On information and belief, Defendant Employers Network Association, Inc. d/b/a Louis Deluca and Affiliates is a New York corporation with its principal place of business located at 20 Madison Avenue, Valhalla, New York 10595.

11. On information and belief, Defendant Employers Innovative Network, LLC is a West Virginia limited liability company with its principal place of business located at 113 Goff Mountain Rd # 3, Charleston, West Virginia 25313. On information and belief, none of its members are residents or citizens of the State of Tennessee.

12. On information and belief, Defendant Jeff Mullins is a West Virginia resident and citizen who can be served with process at 113 Goff Mountain Rd # 3, Charleston, West Virginia 25313.

13. On information and belief, Defendant Ferrell Insurance Agency, Inc., is an Illinois corporation with its principal place of business located at 4219 W. 95th Street, Suite A, Oak Lawn, Illinois 60453.

14. On information and belief, Defendant Financial Security Consultants, Inc., is an Illinois corporation with its principal place of business located at 7501 Lemont Road, Suite 20D, Woodridge, Illinois 60517.

15. On information and belief, Defendant Patrick Keenan is an Illinois resident and citizen who can be served with process at 7501 Lemont Road, Suite 20D, Woodridge, Illinois 60517.

16. On information and belief, Defendant GCG Risk Management Consultants, LLC, dba Flagship Healthcare is an Illinois limited liability company with its principal place of business located at 410 N. Michigan Avenue, Suite 1020, Chicago, Illinois 60611. On information and belief, none of its members are residents or citizens of the State of Tennessee.

17. On information and belief, Defendant Mark Krogulski is an Illinois resident and citizen who can be served with process at 410 N. Michigan Avenue, Suite 1020, Chicago, Illinois 60611.

18. On information and belief, Defendant The HFA Plan is an unincorporated Illinois entity with its principal place of business located at 5328 Catclaw Court, Naperville, Illinois 60564. On information and belief, none of its proprietors are residents or citizens of the State of Tennessee.

19. On information and belief, Defendant Health Care Reform Benefit Solutions, Inc. dba HRB Solutions Inc., is an Illinois corporation with its principal place of business located at 715 Ela Road #2C, Lake Zurich, Illinois 60047.

20. On information and belief, Defendant Catherine Sbarra is an Illinois resident and citizen who can be served with process at 715 Ela Road #2C, Lake Zurich, Illinois 60047.

21. On information and belief, Defendant HUB International Midwest Limited is an Illinois corporation with its principal place of business located at 300 N. LaSalle Street, 17th Floor, Chicago, Illinois 60654.

22. On information and belief, Defendant M. Brown & Associates, Ltd., is an Illinois corporation with its principal place of business located at 2728 Forgue Drive, Suite 100, Naperville, Illinois 60564.

23. On information and belief, Defendant Mark Brown is an Illinois resident and citizen who can be served with process at 2728 Forgue Drive, Suite 100, Naperville, Illinois 60564.

24. On information and belief, Defendant Madison Street Group, LLC, is a Georgia limited liability company with its principal place of business located at 122 N. Madison Street, Thomasville, Georgia 31792. On information and belief, none of its members are residents or citizens of the State of Tennessee.

25. On information and belief, Defendant MGU of the West Insurance Services, Inc. d/b/a OneSource StopLoss Insurance is a California corporation with its principal place of business located at 9245 Laguna Springs Drive, Suite 320, Elk Grove, California 95758.

26. On information and belief, Defendant Trendsetters & Associates, Inc., is an Illinois corporation with its principal place of business located at 187 S. Schuyler Avenue, Suite 450, Kankakee, Illinois 60901.

27. On information and belief, Defendant Williams-Manny Inc. dba Gallagher Williams-Manny Insurance Group is an Illinois corporation with its principal place of business located at 555 S Perryville Rd Ste 101, Rockford, Illinois 61108.

28. On information and belief, Defendant Youngs Management Company, LLC, is a California limited liability company with its principal place of business located at 9245 Laguna Springs Drive, Suite 320, Elk Grove, California 95758. On information and belief, none of its members are residents or citizens of the State of Tennessee.

## JURISDICTION AND VENUE

29. The Court has subject matter jurisdiction over this Complaint under 28 U.S.C. section 1332 because the Plaintiff and Defendants are diverse since they are citizens of different states and the amount in controversy, i.e., the damages sought by the Independent Fiduciary, exclusive of interest and costs, is in excess of $75,000.00.

30. This Court has personal jurisdiction over Defendants because each Defendant has the requisite minimum contacts to subject itself to jurisdiction in this Court by virtue of doing business in Illinois and/or entering agreements and sending/receiving communications to or from Illinois. Defendants were brokers who marketed and sold the AEU Plan to employer groups under producer agreements with the Plan's sponsor, AEU Benefits, LLC ("AEUB"), and its principal aggregator, Black Wolf Consulting, Inc. ("BWC"), an Illinois corporation with its headquarters in Frankfort, Illinois.

31. BWC was, by far, the main aggregator for the AEU Program. The majority of participating employer groups in the AEU Program were enrolled by BWC through brokers such as Defendants.

32. Each Defendant sent and received numerous communications directly to and from persons in Illinois, including employees of BWC, regarding the activities described herein. Numerous emails exist between BWC and each Defendant regarding the activities alleged herein, a large percentage of which originated from BWC in Illinois or were sent to BWC in Illinois. In addition, payments of commissions to each Defendant were made by BWC from a bank account in Illinois.

33. Venue is appropriate in the Northern District of Illinois pursuant to 28 U.S.C. section 1391(b)(2) because a substantial part of the events, acts, transactions and occurrences giving rise to the claims alleged in this complaint occurred within the Northern District of Illinois, and the Defendants entered into agreements to market and sell the AEU Plan with BWC which is located and headquartered in the Northern District of Illinois and which operated out of this District at all relevant times.

## FACTS COMMON TO ALL COUNTS

***Appointment and Authority of Independent Fiduciary***

34. On November 2, 2017, the Secretary of Labor filed suit against the AEU Plan and various entities in the case *Acosta v. AEU Benefits, LLC, et al.*, U.S. District Court for the Northern District of Illinois Case Number 1:17-cv-07931-JHL-SMF ("DOL Action").

35. On November 3, 2017, the Court in the DOL Action entered an Ex Parte Temporary Restraining Order ("TRO").

36. The TRO defined the AEU Holdings, LLC Employee Benefit Plan as the "AEU Plan" and further defined all welfare plans covered by ERISA that are part of or participate in the AEU Plan to be "Participating Plans." The TRO ordered, in part, that Receivership Management, Inc., be appointed as the independent fiduciary to the AEU Plan and Participating Plans.

37. On December 13, 2017, the Court in the DOL Action entered a Preliminary Injunction ("Preliminary Injunction"). The Preliminary Injunction ordered, in part, that the Independent Fiduciary shall serve as the successor Trustee and Plan Administrator of the AEU Plan and Participating Plans and shall have final and exclusive fiduciary authority over the AEU Plan's administration, management, and control of the AEU Plan's assets. Preliminary Injunction ¶ 4.

38. The Preliminary Injunction gives the Independent Fiduciary, among other authorities, the "[a]uthority to identify and pursue claims on behalf of the Participating Plans and the AEU Plan[.]" Preliminary Injunction ¶ 14(j).

39. The DOL Action remains pending before the U.S. District Court for the Northern District of Illinois.

***History of the AEU Program and General Duties of Defendants***

40. Prior to 2015, a company named ALLInsurance Solutions Management, LLC ("AISM"), operated a self-funded health benefits program which was sponsored and administered by AISM. The AISM program focused on providing health benefits coverage for professional employer organizations ("PEOs") and Administrative Services Only ("ASO") arrangements.

41. In July 2015, AISM engaged AEU Holdings, LLC ("AEUH"), through its wholly-owned subsidiary AEUB, to manage the AISM program. AEUB managed that program from July 2015 to late-April 2016.

42. On April 26, 2016, AEUH acquired the assets of AISM pursuant to an Asset Purchase Agreement. AISM's assets included the AISM program. Via the Asset Purchase Agreement, AEUH purchased the assets associated with the AISM program and took over the sales, marketing, underwriting, rating, claims handling, and program advisory functions. This self-funded health benefits program is referred to herein as the "AEU Program."

43. The "AEU Program" encompassed the AEU Plan and all Participating Plans which used the AEU Plan as their health benefits plan as well as all other arrangements, contracts, actions, activities, and events related to the AEU Plan and all other work done for or related to the AEU Plan by AEUH and AEUB.

44. The names AEU Holdings and AEU Benefits are used interchangeably on various AEU Program documents, with the shortened form "AEU" also being used frequently in documents and by the Defendants themselves as well as other officers and employees of AEUH and AEUB. Accordingly, the term "AEU" used in this Complaint refers to AEUH and AEUB collectively.

45. The Defendants were brokers for AEU regarding the AEU Program who worked with and for BWC as aggregator.

46. Aggregators were companies who also worked for the AEU Program. Aggregators brought employer groups together to participate in the AEU Program and recruited brokers to work for them to market and sell the AEU Program.

47. Defendants marketed and sold the AEU Program to individual small and medium size employer groups, PEOs, ASOs, and other similar entities. Each Defendant entered into an oral producer agreement with AEUB as plan administrator and BWC as aggregator to serve as a broker for the AEU Program, under which they were paid significant fees and commissions. The AEU Program was an intended third-party beneficiary of these agreements.

48. In accordance with its agreements with AEUB and BWC, Defendants solicited employer groups to participate in the AEU Program. The employer groups Defendants placed in the AEU Program became the Participating Plans referred to herein.

49. Each Defendant's contractual duties also included delivering required Program documents to its client employer groups for signature, ensuring that required documentation was completed and submitted, following the Program's underwriting standards, and assuring that employer contributions were handled properly.

50. A broker-client relationship existed between each Defendant and the AEU Program, on the one hand, and the Participating Plans it placed with the AEU Program, on the other hand. Each Defendant owed duties to both the AEU Program and the Participating Plans it placed in the AEU Program. Each Defendant owed a duty of reasonable care to the AEU Program and the Participating Plans it placed in the AEU Program, requiring it to exercise good faith, reasonable skill and ordinary diligence in its activities relating to the AEU Program.

51. Each Defendant's duty of care to the AEU Program and the Participating Plans it placed with the AEU Program included obtaining and exercising a reasonable level of competence concerning the complex product being marketed as the AEU Program, its structural requirements, and the legal environment in which is operated.

52. Each Defendant had a duty to the Participating Plans it placed in the AEU Program to ensure that the AEU Program was financially sound and appropriate for the particular client's group health insurance needs.

53. Each Defendant had a duty to inform the AEU Program and the Participating Plans it placed in the AEU Program of all material facts within its knowledge that could affect the transaction or the subject matter of the broker-client relationship.

***Structure and Requirements of the AEU Program***

54. The sales and marketing of the AEU Program was centralized at AEUB so that all marketing material could be controlled by AEUB to ensure that aggregators and Defendants provided accurate information to employer groups. AEUB, directly and through BWC, directed the Defendants' marketing of the AEU Program toward distribution points where a large amount of employer groups could be accessed at one time, e.g., PEOs, associations, and other aggregators, although the AEU Program was also marketed and sold to individual employer groups.

55. AEUB provided a "VEBA Tool Kit Presentation" to Defendants to provide to employer groups describing the voluntary employee beneficiary association ("VEBA") product, how premium equivalents are collected, how claims are paid, and the benefits versus fully insured plans. The toolkit included a power point presentation which stated that the Plan was a "Self-Funded Health Benefits" plan, that "Each employer client has their own self funded plan to deliver medical and prescription drug benefits to employees," and that the Plan was "Not insurance" but was "A self funded trust program with secure stop loss in Bermuda."

56. AEUB provided approved marketing materials to Defendants. The approved marketing materials included the documents that Defendants were to have each Participating Plan complete, including the VEBA Trust Agreement.

57. The VEBA Trust Agreement for each specific VEBA trust stated, in part, as follows related to contributions by the employer and employees:

> RECEIPT OF FUNDS. All monetary employee and dependent contributions received by the Trust shall be deposited through the Plan Administrator in a bank or banks located in the jurisdiction of the Sponsor's, the Plan Administrator's principal place of business or the District of Columbia as agreed by the Trustee(s) . . . .
>
> * * *
>
> COLLECTION OF CONTRIBUTIONS.
>
> (a) ***All Sponsor contributions and all Employee Participants' contributions shall be deposited in the bank accounts for the Trust, which may be an escrow account maintained by the Plan Administrator***. All contributions so received, together with the income therefore shall be held, and may be invested and reinvested, and shall be administered by the Trustees pursuant to the terms of this Agreement.
>
> (b) The Trustee(s) and the actuaries providing services relating to the Plan shall determine the expected costs of the benefits provided under the Plan and the administration of the Trust. The Trustee(s) or the Plan Administrator as designee and its agents shall fix the amount of contributions for the costs of benefits provided under the Plan for eligible employees and their eligible dependents and the administration costs and expenses of the Plan. . . .
>
> . . . .
>
> (d) The Trustee(s), or the Plan Administrator as designee, are specifically authorized to determine the required amount of contributions to pay the expected cost of benefit provided under the Plan and the cost of administration of the Trust and Plan based on the number of eligible employee and dependent, and any other relevant factors. . . . .

VEBA Trust Agreement Art. II §4 & Art. IV § 2(a), (d) (emphasis added).

58. Thus, under the AEU Program, with the guidance of Defendants, each employer was to establish an employee welfare benefit plan governed by ERISA to provide health benefits

solely for its own employees and, if any, their respective spouses and dependents, thereby establishing its own employee welfare benefit plan.

59. Under the AEU Program, with the guidance of Defendants, each employer was to establish a VEBA trust for its specific Participating Plan. Each Trust was supposed to become a tax-exempt organization as a “voluntary employees’ beneficiary association” under Section 501(c)(9) of the Internal Revenue Code (IRC), 26 U.S.C. section 501(c)(9). Participating Plans’ VEBA trusts were to serve as that employer’s health benefits program. The employer was to be the sole grantor of the trust formed under the laws of the District of Columbia to serve as the self-funding mechanism for the health benefits provided by its employer plan to its participating employees.

60. As Defendants knew or should have known, to become a VEBA under Section 501(c)(9) of the IRC, each Participating Plan had to satisfy the following requirements:

- The Participating Plan’s assets must be held in trust for the “members” of the trust under ERISA, i.e., there must be separate accounts for each VEBA.
- The Participating Plan must be an organization of associated employees. Eligibility for membership must be defined by reference to objective standards that constitute an employment-related common bond among such individuals. Employees of one or more unaffiliated employers engaged in the same line of business "in the same geographic locale" also share an employment-related common bond.
- None of the benefits offered by the Participating Plan could inure to private shareholders or individuals.
- The VEBA trust must file a Form 1024 notice with the IRS and then receive a determination from the IRS that the entity is a qualified under IRC § 501(c)(9).
- The Participating Plan must be an association of employees made up of no more than 10 percent owners. Thus, if there are nine or fewer participants in the alleged VEBA, if one of them is the owner, it cannot be a VEBA.

61. The documents that Defendants were to have each employer group complete and execute to meet these requirements and be a Participating Plan were as follows:

- VEBA Trust Agreement
- AEUB Program Advisory Services Agreement
- Collection Agreement with Aggregator
- Certificate to be issued from BPT
- Plan Administrator Services Agreement

62. A formal VEBA Trust Agreement was included within the documents to be signed by each Participating Plan trust, but because of Defendants' negligence, many Participating Plans never signed a VEBA Trust Agreement or other required documents fundamental to the arrangement.

63. The Defendants were to ensure that each Participating Plan (a) named a trustee, engaged a designated administrative representative as fiduciary, and engaged AEUB as its program advisor; (b) obtained an employer identification number; (c) obtained a bond as an acting ERISA trustee; and (d) entered into an agreement with a third party administrator ("TPA") for the TPA to provide enrollment, access to a provider network, and claims administration.

64. Defendants knew or should have known of the "Underwriting Guidelines" for the AEU Program, which were set forth in the in the marketing materials provided to them by AEUB. Those guidelines stated as follows regarding minimum participation by employer groups: "Minimum of 5 active full time employees needed to provide a proposal." The guidelines also state that participation requirements are based on the size, i.e., number of full-time employees, in the group. For groups in which employees contribute toward the cost of the coverage, the document requires 100 percent participation for groups of five lives, "100 less one" percent for groups of six to nine lives, and 75 percent participation for groups of 10 and over.

65. Defendants marketed the AEU Program as including the purchase of insurance via a Bermuda insurance captive.

66. Defendants marketed the AEU Program as including each Participating Plan's trust joining a purchasing trust located in and formed under the laws of Bermuda, which was to indemnify and stand behind each Participating Plan's claim obligations. Defendants owed the Participating Plans a duty to ensure that all required steps related to joining the Bermuda trusts were completed, so that the Participating Plans would comply with applicable law and have stop-loss insurance coverage enforceable against the Bermuda entities. The Bermuda trust was to provide a certificate to each Participating Plan's trust evidencing such indemnity obligation.

67. The Bermuda trust was to purchase insurance coverage to back its indemnity obligations to each Participating Plan's trust. Under the AEU Program's intended structure, each Participating Plan's trust would be co-beneficiary of a single Bermuda trust. The Bermuda trust in turn was to purchase a Primary Policy and an Excess Stop-Loss Policy with the Bermuda trust listed as the named insured for the benefit of each of its beneficiaries. This arrangement was to give each Participating Plan's trust the right to receive payments from claims made against the Primary and Excess Stop-Loss policies for health care costs of the Participating Plan's covered employees. A portion of the premium equivalent contributions collected from the Participating Plans was used to fund the purchase of insurance by the Bermuda trust.

***Defendants' Acts and Omissions Caused the Failure of the AEU Program***

**1. Failure to Obtain Documentation and Qualify Trusts**

68. Because of Defendants' improper actions and inactions, the AEU Program was not operated in accordance with the intended structure, which resulted in the Program failing. Because the Participating Plans were not established as approved VEBAs under IRS rules, because required documentation for each Participating Plan to qualify and be designated as a VEBA trust was not obtained, because no accurate plan documents in the form of a Plan

Document and Summary Plan Description existed for each Participating Plan, because employer contributions were commingled and pooled and not kept separate by Participating Plan, and because ERISA requirements were not met including certificates not being issued to each Participating Plan, no actual VEBA trusts existed and each Defendant should not have permitted its clients to participate in the Program or make contributions to it until these requirements were met.

69. Each Defendant failed to ensure that the employer groups it placed in the AEU Program properly established the required VEBA trust and executed all required documentation associated therewith. As a result, the requirements in the VEBA Trust Agreement and other AEU Program documents were not met.

70. Defendants knew or should have known that employer groups had to execute the required documentation in order to form VEBA trusts and participate in the Program. Defendants knew of the requirements in the VEBA Trust Agreement and other AEU Program documents because AEUB provided those documents to them. Defendants knew from those requirements that each employer group was to be set up as its own VEBA trust. All individual trusts were to be co-settlors of the Bermuda trust. Defendants, however, failed to ensure that these and other structural requirements in the VEBA Trust Agreement and other AEU Program documents were met.

71. Defendants had a duty to know the documents their clients were required to complete and to work with their clients to get the documentation completed. Defendants failed to do so. As a result, the employer trusts were not properly established as VEBAs. Indeed, each Defendant knew or should have known that the employer trusts were not set up as VEBAs with proper documentation.

72. As of July 2017, one Bermuda trust had 683 employer groups/Participating Plans associated with it of which only 128 had signed trust documents, 574 had employer identification numbers (EINs) issued to the employer trusts, none were registered with the District of Columbia, and none had the required ERISA bonds.

73. As of July 2017, a second Bermuda trust had 220 employer groups/Participating Plans associated with it of which 14 had signed trust documents, none had EINs, none were registered with the District of Columbia, and none had the required ERISA bonds.

74. None of the purported VEBA trusts filed a Form 1024 notice with the IRS and, therefore, none received any determination from the IRS that the entity was a qualified under IRC § 501(c)(9). Accordingly, Defendants failed to qualify any VEBA trusts.

75. Each Defendant also failed to ensure that the Bermuda trusts issued certificates to the Participating Plans it placed in the AEU Program. No certificates were issued after January 2016.

76. Finally, Defendants knew or should have known that the AEU Program did not have an accurate or up-to-date Plan Document/Summary Plan Description ("PD/SPD"). Defendants further knew that each VEBA trust was supposed to have its own PD/SPD. Each Defendant knew that the Participating Plans it placed in the Program were never provided with a proper PD/SPD. Defendants either used an old, outdated PD/SPD, or no plan documents at all. Accordingly, each Defendant should have known that the Program was not viable and that it should not be offered or sold to clients.

**2. Failure to Properly Handle and Segregate Fiduciary Funds**

77. Even though each Defendant failed to ensure that the employer groups it placed in the Program were properly set up and the required documents were executed, each Defendant allowed its clients—i.e., the Participating Plans—to be invoiced and knew its clients were making contributions to pay those invoices on a monthly basis.

78. Defendants knew or should have known that that the AEU Program documents required that all employer contributions related to a Participating Plan were to go to a bank account for the VEBA trust. The AEU Program required that each employer group set up a separate VEBA trust with separate accounts and accounting. Based on the VEBA Trust Agreement and other AEU Program documents, Defendants knew or should have known that separate bank accounts, or at least separate accounting, were to be set up for each employer group. Each Defendant, therefore, should have ensured that funds of the employer groups it placed in the AEU Program were kept separate and that separate bank accounts were set up for each such employer group.

79. There were no separate bank accounts or accounting for each purported VEBA trust. Instead, as Defendants knew or should have known, contributions from Participating Plans were commingled and pooled with contributions from other Participating Plans. As Defendants knew or should have known, the contributions from employer Participating Plan trusts were first commingled and pooled in BWC's bank account from which BWC paid the Defendants their fees and commissions. The remaining contribution amounts were then commingled and pooled in designated administrative representative bank accounts from which fees were withdrawn for AEU, the designated administrative representative, and the TPAs. The remaining contributions were then commingled and pooled in the Bermuda accounts. The Bermuda entities took their

fees from the pooled funds and paid stop loss insurance premiums from the funds. The amount remaining was then transferred back to the designated administrative representative to send to the TPAs to pay claims. Neither Defendants nor anyone else ever provided any accountings of funds to the AEU Program or the Participating Plans. Further, each Defendant failed to inform the AEU Program, or the Participating Plans it placed in the Program, about all of the fees and commissions being extracted.

80. Each Defendant failed to ensure that there were separate accounts or accounting for its employer groups, which would have protected them by ensuring each trust's funds only paid for that trust's claims. Instead, Defendants knew or should have known that claims were not paid solely by and for each separate VEBA trust, but were paid from commingled and pooled funds at the direction of AEU based on which providers or claimants were complaining the loudest about unpaid claims, including threatening or filing litigation.

**3. Defendants Improperly Marketed the AEU Program**

81. Each Defendant knew or should have known that the AEU Program was a self-funded plan. The official marketing materials for the AEU Program state that the Program was self-funded. The materials state that the Program was a "Self-Funded Health Benefits" plan, that "Each employer client has their own self funded plan to deliver medical and prescription drug benefits to employees," and that the Program was "Not insurance" but was "A self funded trust program with secure stop loss in Bermuda."

82. Each Defendant had a duty to market the AEU Program accurately and correctly and to make sure its clients understood that the individual trusts were self-funded such that the clients would have to make additional contributions if the monthly premium-equivalent contributions were not sufficient to do so.

83. Defendants failed to tell employers that the Plan was a self-funded plan and that the employers and employees would have to fund any claims of that Participating Plan not covered by contributions or pay all of the trust's incurred claims (after receipt of applicable stop-loss payments). Instead, each Defendant told the Participating Plans it placed with the Program that their monthly premium payment was the maximum cost to the Participating Plan's employer and employees.

84. Each Defendant also failed to ensure that the AEU Program monitored the claim costs of the employer groups it placed in the Program for any required additional contributions by the employer and employees. Other than monthly contributions, Defendants never sought any additional funds from any Participating Plan it placed in the Program to pay excess claims incurred by that Participating Plan.

**4. Defendants Failed to Adhere to Required Underwriting Standards**

85. The actions and inactions of Defendants led to the Participating Plans not being properly underwritten. Instead of Defendants selling the AEU Program only to employer groups with a minimum of five active full-time employees, as was required, Defendants placed Participating Plans with less than five active full-time employees, including many one person "groups." This violated the underwriting requirements of the AEU Program and the stop-loss carriers. This underwriting lapse, along with (a) the failure to separately account for each Participating Plan's contributions and claims, and (b) the failure to assess Participating Plans that incurred claims in excess of contributions and stop-loss proceeds, led to the AEU Program having insufficient funds pay the claims incurred by all Participating Plans.

86. Defendants also knew or should have known that some of the purported VEBA trusts that each placed in the Program were not organizations of associated employees, but were

associations of various different employer groups. Defendants knew that each employer group needed to set up its own VEBA trust and that associations of employer groups could not set up a single VEBA trust. Even so, Defendants placed associations in the AEU Program which were, in fact, set up as a single purported VEBA trust. Defendants knew or should have known that each association of employer groups that had been set up as a single purported VEBA trust was actually a Multiple Employer Welfare Arrangement ("MEWA"), a type of entity subject to state insurance laws and regulations with which the AEU Program was not designed to comply.

**5. Other Failures of Defendants Related to the AEU Program**

87. Defendants knew or should have known from the VEBA Trust Agreement that employer group trustees were required to purchase a bond as trustee for their trust. Each Defendant failed to ensure that the trustee appointed by the employer groups it placed in the Program had such a bond. Many employer groups did not even know that as trustee they were required to secure a bond.

88. Defendants knew that AEUB was required to provide the purported VEBAs with annual independent audits, but Defendants failed to ensure that was done. Defendants never insisted that annual audits of the AEU Program be done and provided to their clients.

89. Despite their knowledge and because of their improper actions and inactions, Defendants allowed the Participating Plans to participate in the AEU Program under circumstances which they knew or should have known would violate ERISA, the IRC, and state insurance laws and regulations. As a direct and proximate result of Defendants' actions and inactions, Defendants improperly allowed the Participating Plans they placed in the Program to make contributions and incur claims, millions of dollars of which remain unpaid.

90. While failing to ensure that all required steps were taken to protect their clients, Defendants did not hesitate to ensure that their own commissions were paid, which were taken directly from the employers' monthly contributions immediately upon their receipt by BWC and then paid by BWC to Defendants.

91. Because the AEU Program was not in compliance with its structural requirements, including those from the AEU Program documents, Defendants should not have allowed their respective clients to participate or remain in the AEU Program and incur claims, and should have directed their respective clients to cease making contributions to the AEU Program and participate in an appropriate program that complied with applicable program requirements, laws, and regulations.

***Program Losses Caused by Defendants Actions and Inactions***

92. One of the Bermuda trusts had outstanding claims in the amount of $15,364,233 incurred on and before December 31, 2016 that had not been paid as of June 30, 2017.

93. Based on claims information available to the Independent Fiduciary, the unpaid claims associated with that Bermuda trust are actually far in excess of $15,364,233, and total approximately $40 million or more. A significant percentage of these unpaid claims was incurred by Participating Plans that Defendants placed in the Program.

94. As of May 12, 2017, claims registers for the second Bermuda trust showed that it had a shortfall of $2,084,375.77 in unpaid claims, and on June 29, 2017, it had $3,196,940.66 in unpaid claims.

95. Based on claims information available to the Independent Fiduciary, the unpaid claims associated with that Bermuda trust are actually far in excess of $3,196,940.66, and total

approximately $10 million or more. A significant percentage of these unpaid claims was incurred by Participating Plans that Defendants placed in the Program.

96. Because the pooled and commingled funds were insufficient to pay all incurred claims, many claims have not been paid.

97. As time passed and more and more claims were not paid (due to insufficient funding), employers and employees made numerous communications to Defendants, AEU and the TPAs that claims were not being paid.

98. The failure to pay claims was so bad that complaints were being made to the DOL, state insurance regulators, and state attorneys general. Many Defendants were aware of such complaints as the brokers for the Participating Plans.

## COUNTS

### Count I: Breach of Contract

99. Independent Fiduciary realleges and incorporates the allegations set forth above as if set forth fully herein.

100. Each Defendant contracted with AEUB and BWC for the benefit of the AEU Program to perform duties as a broker for the AEU Program.

101. Each Defendant breached its contractual duties owed to the AEU Program to perform such duties as alleged above.

102. As a direct and proximate result of Defendants' breaches of their contractual duties, the AEU Program has insufficient funds to pay the claims of the Participating Plans.

103. Each Defendant, therefore, is liable for (a) all of the unpaid claims of each Participating Plan it placed with the AEU Program, and (b) the amount of the fees and commissions it was paid relating to such Participating Plans.

**Count II: Negligence**

104. Independent Fiduciary realleges and incorporates the allegations set forth above, as if set forth fully herein.

105. Each Defendant owed a duty of reasonable care to the AEU Program and to the Participating Plans it placed in the AEU Program. That duty of care, among other things, required each Defendant to ensure that the requirements of the AEU Program including those in the VEBA Trust Agreement and other AEU Program documents were met.

106. Each Defendant breached its duty of care by its actions and inactions alleged above.

107. As a direct and proximate result of each Defendant's breach of duty, (a) the Participating Plans it placed in the AEU Program incurred claims, made contributions to and participated in a program that was not in compliance with Program requirements, ERISA, the IRC, and state insurance laws and regulations, and (b) the AEU Program has insufficient funds to meet the claims obligations of the Participating Plans.

108. Each Defendant, therefore, is liable for (a) all of the unpaid claims of each Participating Plan it placed in the AEU Program, and (b) the amount of fees and commissions it was paid relating to such Participating Plans.

**PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED,** Independent Fiduciary respectfully prays:

1. That the Court award the Independent Fiduciary a judgment against each Defendant in an amount to be proven at trial, plus pre- and post-judgment interest;

2. That the Court award the Independent Fiduciary its costs and expenses;

3. That the Court award the Independent Fiduciary such other, further, and general relief, to which it may be entitled and to which this Court shall deem to be just and equitable; and

4. That a jury be empaneled to hear all issues triable to a jury in this case.

Respectfully Submitted,

**Receivership Management, Inc. in its Capacity as the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan and Participating Plans**

By: s/ Alan F. Curley
One of Its Attorneys

Alan F. Curley (6190685)
Samuel G. Royko (6325838)
Robinson Curley P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100
acurley@robinsoncurley.com
sroyko@robinsoncurley.com

J. Graham Matherne
Andrew J. Pulliam
Wyatt, Tarrant & Combs, LLP
333 Commerce Street, Suite 1400
Nashville, Tennessee 37201
(615) 244-0080
gmatherne@wyattfirm.com
apulliam@wyattfirm.com