# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| RECEIVERSHIP MANAGEMENT, INC., in its capacity as the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan and Participating Plans, | No. 19-cv-01385 |
| Plaintiff, | Judge John F. Kness |
| v. | |
| A.J. CORSO & ASSOCIATES, INC., et al. | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Defendants in this case are insurance brokers who marketed and sold a multiple employer welfare arrangement ("MEWA") known as the "AEU Plan" to their clients, which are hundreds of individual employer-sponsored employee benefit plans (collectively, the "Participating Plans") created under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. Employers created the Participating Plans to provide health benefits to employee participants and their dependents.

Plaintiff Receivership Management, Inc. is the court-appointed Independent Fiduciary ("IF") of the AEU Plan and the Participating Plans (collectively, the "Receivership Entities"). The IF contends Defendants were negligent, breached their contracts, and violated various statutes in connection with the Receivership Entities.

Defendants have moved to dismiss on various grounds. For the reasons discussed below, the motions to dismiss are granted in part and denied in part.

## I.   BACKGROUND

Before 2015, a company called ALLInsurance Solutions Management, LLC ("AISM") sponsored, managed, and administered a self-funded health benefits program for small- and medium-sized employers (the "AISM Program"). In July 2015, AISM engaged non-party AEU Holdings, LLC ("AEUH")—through its wholly owned subsidiary, non-party AEU Benefits, LLC ("AEUB")—to manage the AISM Program. AEUH and AEUB managed the AISM Program from July 2015 to April 2016. Third Amended Complaint ("TAC"), Dkt 224 ¶¶ 116-118.

On April 26, 2016, AEUH and AISM entered into an Asset Purchase Agreement (the "Agreement") by which AEUH acquired AISM's assets, including the AISM Program. Per the Agreement, AEUH took over the sales, marketing, underwriting, rating, claims handling, and program advisory functions of the AISM Program, which became known as the AEU Holdings, LLC Employee Benefit Plan ("AEU Plan"). *Id.* ¶¶ 1, 119.

The AEU Plan is a multiple employer welfare arrangement ("MEWA") as defined by Section 3(40) of ERISA, 29 U.S.C. § 1002(40). An MEWA is defined as "an employee welfare benefit plan or any other arrangement . . . which is established or maintained for the purpose of offering or providing [welfare plan benefits including health benefits] to the employees of two or more employers[.]" *Id.*; TAC ¶¶ 1, 2. The AEU Plan is comprised of hundreds of individual employer-sponsored employee

benefit plans (the Participating Plans) created under ERISA Section 3(1), 29 U.S.C. § 1002(1). Employers created the Participating Plans to provide health benefits to employee participants and their dependents. As part of the AEU Plan, the Participating Plans pooled funds and shared insurance risks. *Id*. ¶ 3.

Following AEUH's purchase of AISM, AEUB entered into a contractual relationship with non-party Black Wolf Consulting, Inc. ("BWC") by which BWC agreed to serve as an "aggregator" for the AEU Plan. As an "aggregator," BWC recruited brokers to market and sell the AEU Plan. By mid-2017, more than 75 percent of the Participating Plans in the AEU Plan had been enrolled by BWC. *Id*. ¶¶ 102-104. Defendants in this case—A.J. Corso & Associates, Inc. ("Corso"); American Benefits Association, Inc. ("ABA"); America's Health Care Alliance, Inc. ("AHCA"); Assurance Agency, Ltd. ("Assurance"); Brown, Brown & Gomberg, Ltd. ("BBG"); Commercial Group Intermediaries, Inc. ("CGI"); Employers Network Association, Inc. d/b/a Louis Deluca and Affiliates ("ENA"); Innovative Insurance Solutions, LLC ("IIS"); Ferrell Agency, Inc. ("Ferrell"); Financial Security Consultants, Inc. ("FSC"); The HFA Plan ("HFA") and its sole owner and member, Mark Krogulski ("Krogulski") (collectively, the "FHA Defendants"); Health Care Reform Benefit Solutions, Inc. d/b/a HRB Solutions, Inc. ("HRB"); HUB International Midwest Ltd. ("HUB"); M. Brown & Associates Ltd. ("MBA"); Madison Street Group, LLC ("MSG"); MGU of the West Insurance Services, Inc. d/b/a OneSource StopLoss Insurance ("MGU"); Trendsetters & Associates, Inc. ("Trendsetters"); Williams-Manny, Inc. d/b/a Gallagher Williams-Manny Insurance Group ("Williams-Manny");

and Innovative Insurance Solutions, LLC ("IIS")—were brokers for the AEU Plan who worked with BWC in its capacity as an aggregator. The AEU Plan, through AEUB and BWC as its agents and authorized representatives, retained Defendants to market, recruit, enroll, and renew the enrollment of Participating Plans. In exchange for each Defendant's successful enrollment or renewal of a Participating Plan, BWC paid each Defendant fees or commissions. *Id*. ¶ ¶ 120, 121, 126.

The AEU Plan is now insolvent and is thus unable to pay an estimated $60 million in unpaid claims owed under its coverage terms. *Id*. ¶ 5. Claimants include hundreds of doctors, hospitals, and other medical providers, as well as thousands of individual employee participants and their dependents, many of whom had their medical care interrupted or terminated because of the AEU Plan's failure. *Id*.

On November 2, 2017, the U.S. Secretary of Labor filed suit against the AEU Plan and various entities. *See Scalia v. AEU Benefits, LLC*, U.S. District Court for the Northern District of Illinois, No. 17-cv-07931 (the "DOL Action"). The court in that matter entered an *ex parte* temporary restraining order ("TRO") that appointed Plaintiff Receivership Management, Inc. as the Independent Fiduciary ("IF") of the AEU Plan and the Participating Plans (collectively, the "Receivership Entities"). *Id*. Dkt. 14 ¶ 4. The TRO granted the IF "full and exclusive fiduciary authority over the AEU Plan's administration, management, and control of the AEU Plan's assets." *Id*.

The IF then sued Defendants on February 26, 2019 and filed a Second Amended Complaint on July 31, 2019. Dkt. 1, 155. To simplify greatly, the IF's theory is that Defendants had a broker-client relationship with both the AEU Plan and the

Participating Plans that gave rise to a "duty of reasonable care," which required Defendants to "obtain[ ] and exercis[e] a reasonable level of competence" concerning the AEU Plan and to "investigate the financial soundness" of the AEU Plan. TAC ¶¶ 136-38, 141. The IF alleges that Defendants breached their duty of care to the Participating Plans because they knew or should have known that the AEU Plan was not in compliance with its structural requirements and was financially unsound, and thus should not have marketed the AEU Plan to the Participating Plans. *Id.* ¶¶ 166, 191. Defendants nonetheless continued to enroll and renew the Participating Plans so that they could continue to receive their commissions, even though those commissions were taken directly from the Participating Plans' monthly contributions. *Id.* ¶ 193. The AEU Plan is now insolvent and more than $60 million of claims remain unpaid, a "significant percentage" of which were incurred by Defendants' Participating Plan clients. *Id.* ¶ 194.

Most Defendants filed motions to dismiss shortly thereafter. *See* Dkts. 161, 171, 173, 175, 177, 179, 181, 182, 195, 198, 206, 217. Before the IF filed its response to these motions, it filed a Third Amended Complaint. Dkt. 224. Instead of requiring the Defendants to re-file their motions to dismiss after the IF brought its Third Amended Complaint, the previously assigned judge ruled that Defendants' pending motions to dismiss the Second Amended Complaint were "deemed filed against" the Third Amended Complaint. Dkt. 223. Defendant IIS filed an additional motion to dismiss on October 31, 2019. Dkt. 244. Thus, in total, there are 13 pending motions to dismiss, all of which are now fully briefed and before the Court for resolution.

## II.   LEGAL STANDARD

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is 5 plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although legal conclusions are not entitled to the assumption of truth, the Court, in evaluating a motion to dismiss, must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *See Iqbal*, 556 U.S. at 678-79; *Ashcroft v. al-Kidd*, 563 U.S. 731, 734 (2011).

Rule 12(b)(1) of the Rules of Civil Procedure allows defendants to press "a facial challenge" to subject matter jurisdiction, which tests whether the complaint includes sufficient factual allegations to establish subject matter jurisdiction. *Silha v. ACT, Inc.*, 807 F.3d 169, 173-74 (7th Cir. 2015). In evaluating such challenges, "a court should use *Twombly-Iqbal's* 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174.

## III. DISCUSSION

### A. Subject Matter Jurisdiction

Several Defendants have moved, under Rule 12(b)(1) of the Federal Rules of Civil Procedure, to dismiss the TAC for lack of subject matter jurisdiction. *See*, *e.g.*, Dkts. 175 at 2; 195 at 4. The IF's asserted basis for federal jurisdiction is diversity jurisdiction under 28 U.S.C. § 1332, which states that district courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of a State and citizens or subjects of a foreign state[.]" 28 U.S.C. § 1332(a)(2). One group of Defendants argues that there is not complete diversity, while another group of Defendants disputes whether the IF has sufficiently pleaded the $75,000 amount-in-controversy requirement as to each of them. As discussed below, neither of these arguments is persuasive, and the Court finds that the IF has adequately established subject matter jurisdiction under 28 U.S.C. § 1332.

### 1. *Diversity of Citizenship*

In their combined reply brief, Defendants ABA, AHCA, CGI, HRB, HFA, and Krogulski ("the Diversity Defendants") argue that the Court lacks subject matter jurisdiction because the diversity-of-citizenship requirement of 28 U.S.C. § 1332 is not met.[1] Dkt. 231 at 2-6. The TAC alleges that the IF is a citizen of Tennessee, ABA is a citizen of New Jersey, AHCA is citizen of Ohio, CGI and HRB are citizens of Illinois, and HFA and Krogulski are citizens of North Carolina. TAC ¶¶ 6, 18, 22, 34, 59, 65. Because the IF, as a citizen of Tennessee, is not a citizen of any of the states of which the Diversity Defendants are citizens, it would appear, based on the allegations in the TAC alone, that complete diversity exists.

The Diversity Defendants argue, however, that the IF's role as a receiver for the Participating Plans means that the IF's standing "is purely representational" and that it is thus "the citizenship of the [Participating] Plans that is relevant, rather than the citizenship of [the IF]," in determining whether complete diversity exists. Dkt. 231 at 3 (emphasis omitted). As the Diversity Defendants acknowledge, Judge Shah appointed the IF to act as a receiver for both the AEU Plan and the Participating Plans. *See* Sec. I, *supra*; No. 17-cv-07931 (N.D. Ill), Dkt. 14. The Diversity Defendants argue that, because several Defendants are Illinois citizens, and because "it seems highly probable that at least one of the 261 Participating Plans is an Illinois citizen[,]" there is not complete diversity. Dkt. 231 at 5.

---

[1] Although the Court would ordinarily call for a plaintiff's views on an issue that a defendant first raises in its reply in support of a motion to dismiss, no such additional briefing is warranted here, as the Court, having undertaken its own review of the issue, finds the Diversity Defendants' diversity-of-citizenship argument to be without merit.

Because the IF is acting as a receiver for the Participating Plans, the citizenship of the Participating Plans themselves is not relevant to the diversity analysis. Numerous courts have held that, for purposes of determining diversity, it is the citizenship of the *receiver*, not the citizenship of the entities in receivership, that matters. *See Mitchell v. Maurer*, 293 U.S. 237, 242 (1934) (in determining diversity of citizenship, "[w]e necessarily treat the primary receivers as the plaintiffs"); *Hoagland ex rel. Midwest Transit, Inc. v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 738 (7th Cir. 2004) (citizenship of receiver, not entity in receivership, considered when determining diversity of parties in action brought by receiver); *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 464 (1980) ("a trustee is a real party to the controversy for purposes of diversity jurisdiction when he possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others"); *Gross v. Hougland*, 712 F.2d 1034, 1037 (6th Cir. 1983) ("a representative may rely upon his citizenship, rather than the citizenship of the party he represents, when he asserts federal jurisdiction based upon diversity of citizenship") (citing *Mecom v. Fitzsimmons Drilling Co., Inc.*, 284 U.S. 183 (1931)); *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 628 (2d Cir. 1976) ("[T]he general common law rule [is] that courts will look to the citizenship of a trustee, receiver, administrator, or other representative, and not the party which he represents, in determining diversity jurisdiction") (citing *Mecom*, 284 U.S. at 186); *Office of Atty. Gen. v. Hess*, No. 08-61840-CIV, 2008 WL 4952477, at *1 (S.D. Fla. 2008) ("A receiver's citizenship for diversity purposes is established by reference to his citizenship, not that of the corporations or persons

whose interests he represents"); *Savino v. Gowing*, No. 03-CV-0170E(SR), 2003 WL 21730177, at *2 (W.D.N.Y. 2003) ("[O]nly the citizenship of a receiver is relevant; the citizenship of the persons or entities in receivership are not relevant for purposes of diversity jurisdiction").

In support of their argument, the Diversity Defendants rely on *Northern Trust Co. v. Bunge Corp.*, 899 F.2d 591 (7th Cir. 1990). But that case involved a corporation that brought its claims, in essence, "as an *agent* representing the interests of others." *Id*. at 595 (emphasis added). Because the corporation, as an agent, had no stake in the litigation specific to itself, the proper focus was on the citizenship of the individual sellers of the stock that the corporation was representing. *Id*. That is not the situation here. This is not a case where, as in *Northern Trust*, the IF is acting as an *agent* of the Receivership Entities. Instead, it is acting as a *receiver*, and thus stands in the shoes of the Receivership Entities for the purpose of enforcing their rights. Accordingly, the Court concludes that there is diversity of citizenship in this action under 28 U.S.C. § 1332 because the receiver is a citizen of Tennessee and none of the Defendants are citizens of Tennessee.

## 2.    *Amount in Controversy*

In addition to complete diversity, the IF must establish by a preponderance of the evidence that the amount in controversy exceeds $75,000 for each Defendant. *See LM Ins. Corp v. Spaulding Enters., Inc.*, 533 F.3d 542, 547 (7th Cir. 2008). Defendants MBA, ABA, CGI, HRB, HFA, Krogulsi, and ENA argue that the IF has not established the requisite amount in controversy.

Whether the amount in controversy exceeds $75,000 is a prediction, not a fact. *See Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 541 (7th Cir. 2006). The proponent of federal jurisdiction (in this case, the IF), however, must allege and prove the "jurisdictional facts" that determine the amount in controversy by a preponderance of the evidence. *Id*. Once the proponent has established these facts, "the proponent's estimate of the claim's value must be accepted unless there is a 'legal certainty' that the controversy's value is below the threshold." *Id*. (cleaned up). *See also Back Doctors Ltd v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 830 (7th Cir. 2011) ("the estimate of the dispute's stakes advanced by the proponent of federal jurisdiction controls unless a recovery that large is legally impossible"). This demonstration "may be made from either side's viewpoint," and may include evidence such as affidavits. *Meridian*, 441 F.3d at 541-42.

Here, Defendants MBA, ABA, CGI, HRB, HFA, Krogulski, and ENA have challenged the amount in controversy. Many of these Defendants, as well as the IF, have submitted affidavits or other evidence they believe demonstrate that the requisite amount in controversy for diversity jurisdiction has or has not been met. The Court will examine the evidence (or lack thereof) as it relates to each of these Defendants in turn.

### a. **MBA**

The IF alleges that MBA was paid $108,210 in commissions for placing Participating Plans into the AEU Plan. TAC ¶ 78. In support of this allegation, the IF has submitted a declaration by Robert E. Moore, Jr., President of Receivership

Management, Inc. *See* Dkt. 225-1. Mr. Moore identifies a list of commission checks that BWC issued to MBA totaling $108,210. *Id*. ¶ 3, Exh. A. MBA does not challenge this evidence in its reply brief. Dkt 236. The Court is satisfied that the IF has presented sufficient evidence demonstrating that the amount in controversy as it relates to MBA exceeds the jurisdictional threshold of $75,000.

### b.  ABA

The IF alleges more than $533,000 in unpaid claims associated with Participating Plans that ABA placed in the AEU Plan. TAC ¶¶ 19-20. In response, ABA has submitted a declaration by Dawn Ann Raccuglia, ABA's Vice President of Operations. Dkt. 175-1. Ms. Raccuglia states that she has reviewed ABA's records and was unable to determine the amount of unpaid claims incurred by clients that ABA placed into the AEU Plan, but that the "alleged figure of $533,000 seems very disproportionately high[.]" *Id*. ¶ 3.

Ms. Raccuglia's affidavit is insufficient to establish ABA's claim that the amount-in-controversy requirement is not met. Ms. Raccuglia admits that her declaration is based upon a "review of the business records of ABA" and not on her personal knowledge. *Id.* ¶ 1. Unless an affidavit is based on an affiant's personal knowledge, it may not be used for purposes of making a jurisdictional determination. *See Am.'s Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1074 (7th Cir. 1992) ("only [an] affidavit made on personal knowledge has any value"). Furthermore, Ms. Raccuglia has not attached any documentation to her declaration that would otherwise aid the Court in determining whether the IF's $533,000 figure is

inappropriate.

The IF, on the other hand, has submitted detailed documentary evidence showing that ABA-related unpaid claims total at least $560,036.91—even more than the $533,000 alleged in the TAC. *See* Dkt. 225-1 ¶ 5; *id*. Exh. B, at 24, line 383, column O. ABA does not challenge this evidence in its reply brief. Dkt 231. The Court is satisfied that the IF has presented sufficient evidence demonstrating that the amount in controversy as it relates to ABA exceeds the jurisdictional threshold of $75,000

### c.  <u>CGI</u>

The IF alleges GCI was paid at least $89,000 in commissions for placing Participating Plans in the AEU Plan. TAC ¶ 35. To support this number, the IF has submitted detailed documentary evidence demonstrating that BWC issued checks payable to "Commercial Group Intermediaries" in the amount of $89,170. Dkt. 225-1 ¶ 7; *id*. Exh. E.

CGI, on the other hand, claims it received commissions of only $41,286 "paid by BWC[.]" Dkt. 175 at 3. In support, CGI relies on the affidavit of Linda Herman, CGI's Controller. *See* Dkt. 175-2. Ms. Herman's affidavit challenges the amount of commissions that the IF alleges, but does not attach any conclusive documentary evidence demonstrating that those calculations are wrong. Furthermore, CGI's reply brief does not refute the IF's $89,170 figure. Dkt. 231. Weighing the IF's documentary evidence against Ms. Herman's unsupported declaration, the Court is satisfied that the IF has presented sufficient evidence demonstrating that the amount in controversy as it relates to CGI exceeds the jurisdictional threshold of $75,000.

### d.    **HRB**

The IF alleges HRB received commissions of $19,700. TAC ¶ 68. HRB admits it received $19,000 in commissions. Dkt. 175 p. 4; Dkt 175-4 ¶ 3. The IF also alleges more than $83,000 in unpaid claims associated with Participating Plans that HRB placed with the AEU Plan, *see* TAC ¶ 69, but the IF has since determined that that those Participating Plans have unpaid claims totaling $422,063.26. *See* Dkt. 225-1, Exh. 1 ¶ 11.

HRB has submitted evidence in the form of an affidavit from Catherine Sbarra, HRB's CEO and President, who states that, "[b]ased on [HRB's] analysis, the total amount of unpaid claims incurred by clients HRB placed in the AEU Plan is believed to be $21,055.01." Dkt. 175-4 ¶ 4. Ms. Sbarra did not include any documentation supporting the $21,055.01 figure or explain why HRB "believes" that to be the correct amount of unpaid claims. Furthermore, HRB's reply brief does not refute the IF's evidence that the jurisdictional threshold has been met. Weighing the IF's documentary evidence against Ms. Sbarra's unsupported declaration, the Court is satisfied that the IF has presented sufficient evidence demonstrating that the amount in controversy as it relates to HRB exceeds the jurisdictional threshold of $75,000.

### e.    **HFA Defendants**

The IF alleges HFA and Krogulski (collectively, the "HFA Defendants") received commissions in excess of $105,000, with checks made out to E1440, LLC, an entity controlled by Krogulski. TAC ¶ 62. In support, the IF has submitted documentary evidence showing that BWC issued checks payable to E1440, LLC

totaling $105,285. Dkt 225-1 ¶ 9, Exh. G. In addition, since the time it filed the TAC, the IF has also determined that the Participating Plans Krogulski placed in the AEU Plan have unpaid claims asserted against them totaling $704,675.63. *Id.* ¶ 10, Exh. H. The IF has also submitted detailed spreadsheets verifying these amounts. The HFA Defendants do not challenge this evidence in their reply brief.

Mr. Krogulski, however, has submitted an affidavit in which he states that he received commissions of only $73,225. Dkt. 175 at 4. In support, Mr. Krogulski attached as an affidavit in which he claims "E1440, LLC received total commissions of $73,225 from BWC, for business directly placed with BWC relative to the AEU Plan." Dkt. 175-3 ¶ 6. This figure, however, is not supported by any documentary evidence. Weighing the IF's documentary evidence against Mr. Krogulski's unsupported declaration, the Court is satisfied that the IF has presented sufficient evidence demonstrating that the amount in controversy as it relates to the HFA Defendants exceeds the jurisdictional threshold of $75,000.

### f. ENA

Finally, ENA, in its reply brief, argues that alleged facts demonstrating that the amount-in-controversy requirement is satisfied as to ENA because the IF "highlighted commissions paid to other defendants in the first six pages of its Response, but fails to identify any commissions paid to ENA." Dkt. 232 at 5. What ENA overlooks is that the reason the IF provided detailed information in its response brief as to the commissions paid to certain Defendants is because those Defendants brought jurisdictional challenges in their respective motions to dismiss. If ENA had

raised this issue in its brief in support of its motion to dismiss, the IF would have had the burden of supporting its jurisdictional claims with competent proof. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936) (if a plaintiff's "allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof"). But because the IF was unaware that ENA, unlike the Defendants discussed above, took issue with its allegations regarding the amount in controversy, it understandably did not support those allegations as to ENA with any "competent proof" in its response brief. Accordingly, at this juncture, the Court will deny ENA's motion to dismiss to the extent it rests on the IF's purported failure to establish he requisite amount in controversy—an issue, as noted above, ENA first raised in its reply. ENA may file a motion for summary judgment on the issue at a future date if it believes it has the appropriate documentary evidence to support such an argument.

## B. Standing

Defendants FSC and ENA (collectively, the "Standing Defendants") argue that the IF does not have standing to brings its claims. Dkts. 184 at 5-6; 217 at 8-10. The " 'irreducible constitutional minimum' of standing" consists of three elements: (1) injury in fact; (2) causation; and (3) redressability. *Spokeo, Inc. v. Robins*, —U.S. —, 136 S.Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The burden to establish each element is on the plaintiff. *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)). To meet this burden at the pleading stage, " 'the plaintiffs' complaint must contain sufficient factual allegations

of an injury resulting from the defendants' conduct, accepted as true, to state a claim for relief that is plausible on its face.' " *Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1057 (7th Cir. 2018) (quoting *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 588 (7th Cir. 2016)).

The Standing Defendants challenge the "injury in fact" element of the standing framework and argue that the IF does not have standing to bring claims on behalf of the Receivership Entities because any injury to them "has been borne by either the plan participants or service providers under the plan."[2] Dkt. 184 at 6. In other words, the Standing Defendants argue that it is the individual employee-participants and medical providers—not the Receivership Entities themselves—who were truly injured. Because the claims belong to these injured third parties and not the Receivership Entities, the Standing Defendants argue, the IF does not have standing to bring its claims. *Id*.

Here, the IF alleges that Defendants' wrongful conduct resulted in the Participating Plans' paying excessive fees and commissions and incurring liabilities when they lacked appropriate insurance coverage. As a result, the Participating Plans lacked sufficient assets to satisfy the individual policyholders' claims. TAC ¶ 202. That the Defendants' wrongful conduct ultimately affected those policy holders does not mean that those policy holders "own" the claims. *See Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) (receiver had standing to bring claims on behalf of corporation in receivership harmed by improper transactions, even where funds,

---

[2] The Court assumes that by "the plan," ENA refers to either the AEU Plan or the Participating Plans.

when returned, would be used to satisfy claims of corporation's creditors).

Both the IF and the Standing Defendants argue that *Scholes v. Schroeder*, 744 F. Supp. 1419 (N.D. Ill. 1990) supports their position. In *Schroeder*, receiver Steven Scholes brought claims "framed in terms of alleged fraud on the investors" in the companies in receivership. *Id.* at 1523. The court held that Scholes could not bring claims on behalf of these third-party investors because "[f]raud on *investors* that damages those *investors* is for those *investors* to pursue-not the receiver. By contrast, fraud on the *receivership entity* that operates to *its* damage is for the *receiver* to pursue[.]" *Id.* at 1422. Because the IF has adequately alleged that the Receivership Entities suffered an injury—even if other entities, such as the employer-sponsors and medical providers, ultimately felt the ripple effects of those injuries—the IF has standing to pursue its claims.

## C.  Statute of Limitations

Defendants Assurance, Williams-Manny, BBG, FSC, Trendsetters, and ENA (collectively, the "Limitations Defendants") argue that the IF's claims are time-barred. *See* Dkts. 161 at 4-6; 177 at 7-8; 181 at 3-4; 184 at 12-14; 206 at 6-8; 217 at 10-11. Although a statute of limitations defense is "not normally part of a motion under Rule 12(b)(6)," it may be appropriate "where 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations.'" *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)). Because, as

18

discussed below, the Court cannot determine as a matter of law that the IF's initial complaint was filed after the applicable limitations period expired, the Court denies the Limitations Defendants' motions to dismiss to the extent they seek to dismiss the IF's claims as time-barred.

### 1. Application of Section 13-214.4 to the IF's Claims

The Limitations Defendants argue that the two-year statute of limitations in 735 ILCS 5/13-214.4 ("Section 13-214.4") applies to all the IF's claims.[3] Section 13-214.4 provides:

> All causes of action brought by any person or entity under any statute or any legal or equitable theory against an insurance producer, registered firm, or limited insurance representative concerning the sale, placement, procurement, renewal, cancellation of, or failure to procure any policy of insurance shall be brought within 2 years of the date the cause of action accrues.

735 ILCS 5/13-214.4. Defendants argue that Section 13-214.4 covers *all* actions brought against an insurance producer. *See, e.g.*, Dkt. 161 at 4-5. The IF, on the other hand, contends that Section 13-214.4 applies to actions brought against insurance producers that concern only "the sale, placement, procurement, renewal, cancellation of, or failure to procure" an insurance policy. Dkt. 225 at 41. Thus, the IF argues, to the extent its allegations concern activities other than those specifically listed in Section 13-214.4, other statutes of limitations will apply. *Id*. For example, the IF has

---

[3] Although several of the Limitations Defendants are based in states other than Illinois— *see* Dkts. 173 at 8 (MSG – Georgia); 175 at 13 (ABA – New Jersey; AHCA – Ohio; HFA/Krogulski – North Carolina); 198 at 8 (MGU – California); 217 at 10-11 (ENA – New York)—none of these Defendants argues that any statute of limitations other than Section 13-214.4 applies to the IF's claims.

alleged that Defendants failed to ensure proper handling of participant contributions, allowed contributions to be comingled, and failed to ensure proper accounting of funds. TAC ¶¶ 168-177. The IF contends that those activities form the basis of its negligence and breach-of-contract claims and thus are subject to a five-year statute of limitations under Illinois law, rather than the two-year period of Section 13-214.4. Dkt. 225 at 41.

The Court agrees with the Limitations Defendants that Section 13-214.4's two-year statute of limitations applies to all the IF's claims. Illinois courts examining the limitations period in Section 13-214.4 have held that "[t]he statute as written is unequivocal and subject to only one reasonable interpretation: that *all* causes of action brought by *any* person or entity under *any* theory against an insurance producer shall be brought within two years of the date the cause of action accrues." *Indiana Ins. Co. v. Machon & Machon, Inc.*, 753 N.E.2d 442, 445 (Ill. App. Ct. 2001). *Accord Breitweiser v. Highland Capital Brokerage, Inc.*, No. 1-18-1898, 2019 WL 6337358, at *3 (Ill. App. Ct. Nov. 25, 2019). These decisions suggest that, contrary to the IF's assertions, *any* claim brought against an insurance producer is subject to the limitations period of Section 13-214.4, regardless of the underlying factual or legal basis for that claim. *See Am. Family Mut. Ins. Co. v. Krop,* 120 N.E.3d 982, 987 (Ill. 2018) (applying two-year limitations period under Section 13-214.4 to declaratory judgment action brought against insurance provider).

The Court recognizes that at least one Illinois court has criticized the holdings in *Indiana Insurance* and its progeny—that "*all* causes of action brought by *any*

person or entity under *any* theory against an insurance producer" must be brought within two years of accrual—as "render[ing] the limiting language [of Section 13-214.4] meaningless." *Martin Cartage & Exp., Inc. v. Gallagher*, No. 2-10-0258, 2011 WL 10304087, at *4 (Ill. App. Ct. Feb. 22, 2011). But that statement, made in *dicta* in an unpublished decision, is not binding authority. Although the Court is unaware of any decision of the Illinois Supreme Court analyzing the applicability of Section 13-214.4, it has held that the statute is generally applicable to tort claims. *See Krop*, 120 N.E.3d at 987. This Court, when interpreting Illinois law, is bound by the decisions of the Illinois Appellate Court, and absent any indication that the Illinois Supreme Court has overruled these decisions, this Court must follow them. Because the Illinois Supreme Court has not clearly indicated that *Indiana Insurance* is bad law, this Court lacks the authority to disregard it. *See In re Emerald Casino, Inc.*, 867 F.3d 743, 765 (7th Cir. 2017) ("[A] federal court applying state law should apply the law as announced by intermediate state courts unless there are reasons that convince the federal court that the state's high court would rule differently").

### 2. *Date of Accrual*

Having determined that the two-year limitations period of Section 13-214.4 applies to the IF's claims, the Court must next determine when that limitations period accrued. The IF argues that, in the insurance context, "the discovery rule delays the accrual date to when a party became aware that an insurer would be unable to pay claims." Dkt. 225 at 42. The discovery rule "tolls the limitations period until a person "knows or reasonably should know of his injury and also knows or

reasonably should know that it was wrongfully caused." *Scottsdale Ins. Co. v. Lakeside Cmty. Comm.*, 76 N.E.3d 1, 6-7 (Ill. App. Ct. 2016) (citing *Knox College v. Celotex Corp.*, 430 N.E.2d 976 (Ill. 1981)).

The Limitations Defendants argue that the limitations period began to run on April 26, 2016—the date that AEUH purchased the AISM Program. TAC ¶ 19; *see, e.g.*, Dkt. 161 at 5. Thus, according to the Limitations Defendants, the statute of limitations on IF's claims expired two years later on April 26, 2018—well before the IF filed its first complaint on February 26, 2019. Dkt. 1. These Defendants fail to explain, however, why AEUH automatically knew or should have known on that date that the AEU Plan was not viable. The question of when AEUH ultimately discovered that the AEU Plan was not viable is a question of fact inappropriate for resolution on a motion to dismiss. *See Scottsdale*, 76 N.E.3d at 7-8 (the time that a plaintiff "knows or reasonably should have known about an injury and that it was wrongfully caused presents a question of fact").

The Limitations Defendants rely heavily upon *Krop* to support their assertion that the IF's claims accrued on April 26, 2016. *See, e.g.*, Dkt. 161 at 6. In *Krop*, the plaintiffs sought insurance coverage under their homeowner's insurance policy after they were sued for defamation. Their insurance provider denied coverage, and the plaintiffs sued the provider and the insurance agent who sold them the policy for negligently failing to provide them a policy that contained the coverage they requested. The Illinois Supreme Court held that the statute of limitations accrued on the date that the insurance policy was issued because the plaintiffs could have—and

should have—read their policy at that time to ascertain what was covered and what was not. *Id.* at 992-93.

The Court finds the facts of *Krop* to be distinguishable. Unlike in *Krop*, where the plaintiffs could have easily read their insurance policy to determine what it did or did not cover, it is not as clear from the facts alleged in the TAC that AEUH could have made a simple determination about the viability of the AISM's assets on the date they were acquired. The Court is sympathetic to the Limitations Defendants' arguments that nothing prevented AEUH and the Participating Plans from "read[ing] their policies, the plan documents, or any other agreements" to understand exactly what it was purchasing at the time it acquired AISM's assets on April 26, 2016. *See, e.g.*, Dkt. 238 at 3. But as the IF points out, this argument leads to the illogical conclusion that AEUH knew at the time it purchased AISM's assets, including the AISM Program (which later became the AEU Plan), that it was purchasing a non-viable program. Dkt. 225 at 43 n. 2. The issue of whether the discovery rule applies here is a question of fact that the Court cannot resolve at the motion to dismiss stage. *See Andonissamy*, 547 F.3d at 847 (a motion to dismiss should only be granted on statute of limitations grounds when the complaint "plainly reveals that an action is untimely under the governing statute of limitations"). This is not a case where the allegations where the complaint "plainly reveals" that the action is untimely (that is to say, that the AEU Plan and the Participating Plans knew or reasonably should have known of the injury on the date that AEUH Purchased the AISM Program). *See id.*

Finally, two of the Limitations Defendants make fact-specific arguments that must be addressed. Defendant BBG argues that it "last recommended the AEU Program to a client prior to January 1, 2017" and that accordingly, the two-year statute of limitations on any alleged tortious conduct by BBG expired, at the latest, on January 1, 2019—before the date the IF filed its first complaint on February 26, 2019. Dkts. 1; 181 at 4. In support, BBG attaches an affidavit from Gerald Gomberg, President of BBG, who states that "BBG did not recommend the [AEU Plan] to any clients after January 1, 2017." Dkt. 181-1.

FSC argues that AEUH "necessarily discovered an injury in late 2016, at the latest" because there were unpaid claims at the time. Dkt. 184 at 13. In support, it attaches an Order to Cease and Desist from the U.S. Department of Labor ("DOL Order") dated November 6, 2017 that purportedly put AEUH on notice that the AEU Plan was systematically underfunded and failed to properly process insurance claims, leading to "widespread nonpayment of benefits[.]" Dkt. 184-4.

The Court, however, may not consider the merits of these arguments, as the documents on which they rely—Mr. Gomberg's affidavit and the DOL Order—are not properly before the Court. In deciding a motion to dismiss, a district court may only consider, in addition to the complaint itself, documents that are either attached to the complaint or are central to the claims set forth in the complaint. *See* Fed. R. Civ. P. 12(d); *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (when ruling on a motion to dismiss, "a court may consider, in addition to the allegations set forth in the complaint itself . . . documents that are central to the complaint and are referred

24

to in it"). This narrow exception is "aimed at cases interpreting, for example, a contract" and "is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment[.]" *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).

The Court acknowledges that BBG requests that the Court "accept the [Gomberg] affidavit in support of [its motion to dismiss] and, when ruling, treat this motion as one for summary judgment[.]" Dkt. 181 at 3 n. 1. Mr. Gomberg's affidavit, however, does not fit the narrow exception recognized by the Seventh Circuit. *See Levenstein*, 164 F.3d at 347. As such, to consider the documents on a motion to dismiss, the Court would need to exercise its discretion and convert BBG's motion to dismiss into a motion for summary judgment under Rule 12(d) of the Federal Rules of Civil Procedure. *See Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) (affirming district court's refusal to convert a motion to dismiss into a motion for summary judgment based on the court's discretion). The Court declines to exercise its discretion to do so at this time. This does not however, preclude BBG from filing a future motion for summary judgment based on its statute of limitations arguments.

Because the TAC does not refer to these extraneous documents and because they are not "central" to the allegations in the TAC, the Court must disregard them. BBG and FSC may very well have meritorious statute-of-limitations arguments based on extraneous documents, but the place for that evidence is a summary judgment motion, not a motion to dismiss.

### D.    "Group" Pleading

Several Defendants argue that the Court should dismiss the TAC because the IF brings allegations against "each Defendant" or "all Defendants" and that this is an improper "group pleading" that "comingles" the Defendants and fails to put them on notice as to the specific allegations against them. *See, e.g.*, Dkts. 177 at 9; 195 at 7-9; 239 at 3-6. But "[t]here is no 'group pleading' doctrine, per se, that either permits or forbids allegations against defendants collectively[.]" *Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019). All Rule 8 of the Federal Rules of Civil Procedure requires is that a complaint "provide[ ]sufficient detail to put the defendants on notice of the claims." *Id.* (citation omitted). *See also* Fed. R. Civ. P. 8(a) ("A pleading that states a claim for relief must contain[ ] . . . a short and plain statement showing that the pleader is entitled to relief"); *Marposs Societá Per Azioni v. Jenoptik Auto. N. Am., LLC*, 262 F. Supp. 3d 611, 617-18 (N.D. Ill. 2017) ("Such so-called 'group pleading' does not violate Fed. R. Civ. P. 8 so long as the complaint provides sufficient detail to put the defendants on notice of the claims"); *Frazier v. U.S. Bank Nat. Ass'n*, No. 11 C 8775, 2013 WL 1337263, at *3 (N.D. Ill. Mar. 29, 2013) (collecting cases and holding that references in the complaint to "Defendants" provided "sufficient factual detail" to provide each Defendant with fair notice of the plaintiff's claims).

Here, the allegations in the TAC are not "so sketchy that the complaint does not provide the type of notice of the claim to which the defendant[s] [are] entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007). This is not a case, as certain defendants argue (*see, e.g.*, Dkt. 235

at 4), of "collective responsibility" where it is impossible to determine from the face of the complaint which defendant is accused of which wrongful act. *See Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed"). The TAC specifies that it directs "all allegations in this [Third] Amended Complaint that refer to 'Defendants' or 'Each Defendant' to all of the Defendants[.]" TAC ¶ 11. Thus, the TAC makes clear that, even though the allegations may not individually list out every Defendant for every allegation, an allegation that relates to "Defendants" refers to each Defendant individually. These allegations are specific enough for Defendants "to understand they are specifically implicated." *Sanders v. JGWPT Holdings, Inc.*, No. 14 C 9188, 2016 WL 4009941, at *10 (N.D. Ill. July 26, 2016). Accordingly, the Court concludes that the "group" allegations do not require dismissal of the TAC. *See Receivership Mgmt., Inc. v. AEU Holdings, LLC*, No. 18 C 8167, 2019 WL 4189466, at *10 n. 15 (N.D. Ill. Sept. 4, 2019) ("group pleading" permissible "if it provides enough detail about the nature of the allegations to put each defendant on fair notice of the claims" and allegations that all member of a group committed a certain wrongful act are plausible).

### E. Joinder

Several Defendants argue that they have been improperly joined. *See* Dkts. 175 at 7-8; 177 at 13-14; 179 at 2-3; 195 at 7-9; 206 at 12-13. Under Rule 20(a)(2) of

the Federal Rules of Civil Procedure, "persons" may be joined in one action as defendants if:

> (A)    any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B)    any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2)(A)-(B). Joinder promotes judicial efficiency and is strongly encouraged. *See Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2012) ("The purpose of Rule 20(a) in permitting joinder . . . is to enable economies in litigation"); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966) ("joinder of claims, parties and remedies is strongly encouraged"). Furthermore, district courts are given "wide discretion . . . concerning the joinder of parties." *Chavez v. Ill. State Police*, 251 F.3d 612, 632 (7th Cir. 2001).

As discussed below, certain Defendants argue that they are improperly joined because the IF's allegations fail to meet the standard for proper joinder as set forth in Rule 20(a)(2). But because both requirements of Rule 20(a)(2) are satisfied here, the Court denies Defendants' motions to dismiss to the extent they rest on improper joinder.

### 1.    *Same Transaction or Occurrence*

First, Rule 20(a)(2)(A) allows defendants to be joined in a single action if the claims against them "arise out of the same transaction, occurrence, or series of transactions or occurrences[.]" Fed. R. Civ. P. 20(a)(2)(A). Although the Federal Rules

28

do not define "transaction or occurrence," courts have generally adopted a "logical relationship" test. *See, e.g.*, *Lozado v. City of Chicago*, No. 10 C 1019, 2010 WL 3487952, at *2 (N.D. Ill. Aug. 30, 2012) (the term "transaction or occurrence" under Rule 20 comprehends "a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship") (quoting *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974) ("[A]ll 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence")); *In re Price*, 42 F.3d 1068, 1073 (7th Cir. 1994) (discussing the "same transaction or occurrence" requirement in the context of Rule 13); *In re EMC Corp.*, 677 F.3d 1351, 1358 (Fed. Cir. 2012) ("[I]ndependent defendants satisfy the transaction-or-occurrence test of Rule 20 when there is a logical relationship between the separate causes of action. The logical relationship test is satisfied if there is substantial evidentiary overlap in the facts giving rise to the cause of action against each defendant.")

Defendants argue that the allegations in the TAC fail to meet this standard because the IF has brought suit against a "seemingly-random group of alleged insurance brokers and agents who apparently received some amount of commissions from BWC" and because the IF "has not pled any relationship among the Defendants, or pled that Defendants acted in concert, coordinated, or conspired with respect to any transaction, occurrence, or series of transactions or occurrences." *See, e.g.*, Dkt. 175 at 8. The Court, however, cannot perceive anything "seemingly random" about the Defendants named in the TAC. While the IF may not have pleaded that the

Defendants acted "in concert," its claims against them arise out of a series of occurrences that demonstrate a logical relationship. The IF alleges that each Defendant was a broker that worked with BWC to market, recruit, and enroll the Participating Plans in the AEU Plan. TAC ¶ 120. As part of this relationship, "[e]ach Defendant entered into an oral and/or implied-in-fact contract with the AEU Plan to serve as an insurance producer and broker for the AEU Plan." *Id.* ¶ 121. The Court is satisfied that these allegations demonstrate a logical relationship between the set of occurrences that gives rise to the IF's claims, even though each of those occurrences, viewed individually, may have involved different defendants.

In support of their position, Defendants rely on *George v. Smith*, 507 F.3d 605 (7th Cir. 2007). In that case, the Seventh Circuit instructed that a "buckshot" complaint—that is to say, a complaint in which a plaintiff alleges that "A defrauded [him], B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions—should be rejected." *Id.* at 607. In that case, the prisoner plaintiff sought to join 24 defendants and about 50 distinct claims but made no effort to show that those defendants had participated in the same series of transactions. The plaintiff's complaint included allegations that each defendant failed to provide the plaintiff with adequate medical care, censored his mail, and mishandled his parole application, among other alleged wrongdoings. *Id.* at 607-08. It was unclear to the Court of Appeals which specific claims were brought against which specific defendants, and the court held that such a complaint was an impermissible "mishmash." *Id.* at 607. But unlike the plaintiff in *George*, the IF's

allegations in the present case are specific and logically related. The IF alleges that every defendant violated its duties as an insurance broker and is liable to the entities in receivership for both breach of contract and negligence, as well as under various state statutes. The TAC is not the type of impermissible "buckshot" complaint contemplated in *George*.

### 2. *Common Questions of Law or Fact*

Joinder is proper under Rule 20(a)(2)(B) only if there is a "question of law or fact common to all defendants[.]" Fed. R. Civ. P. 20(a)(2)(B). Defendants do not make a serious attempt to argue that this element is not met here. The allegations in the TAC demonstrate multiple common questions of law and fact, including questions related to negligence, breach of contract, and statutory liability. Such questions include, for example, whether each Defendant improperly marketed the AEU Plan and when each Defendant knew the AEU Plan was insolvent. Dkt. 225 at 9.

Because the IF has properly alleged both elements of Rule 20(a), the Court finds that no Defendants have been improperly joined and denies the motions to dismiss to the extent they rely on a theory of improper joinder. *See Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1018 (N.D. Ill. 2015) (denying motion to dismiss based in part on improper joinder and holding that severance is only appropriate where there is no "common thread" tying together a plaintiff's allegations against multiple defendants).

### F. Indispensable Persons

Next, several Defendants argue that the Court should dismiss the TAC under Rule 12(b)(7) of the Federal Rules of Civil Procedure for "failure to join a party under

Rule 19." Fed. R. Civ. P. 12(b)(7). *See* Dkts. 171 at 8-9; 173 at 7-8; 175 at 4-6; 177 at 14-16; 179 at 13-15; 198 at 7-8; 206 at 13-15. A motion to dismiss under Rule 12(b)(7) may be granted if a plaintiff has failed to join a party as required by Rule 19. The purpose of Rule 19 "is to permit joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources." *Moore v. Ashland Oil, Inc.*, 901 F.2d 1445, 1447 (7th Cir. 1990).

Joinder under Rule 19 consists of a two-part analysis. First, "Rule 19(a) requires joinder when the presence of the party to be joined is essential to the litigants' complete relief, or when the party to be joined must be present to protect its own or another party's interests." *Boulevard Bank Nat'l Ass'n v. Philips Med. Sys. Int'l*, 15 F.3d 1419, 1422 (7th Cir. 1994). If a party deemed "necessary" Rule 19(a) cannot be joined, a district court then considers whether that necessary party is "indispensable" under Rule 19(b). *Id.* at 1422-23. If the necessary party that cannot be joined is indispensable, the district court may dismiss the action. *Id.*

Several Defendants identify AEUB, AEUH, their principals, BWC, or the Participating Plans' employer-sponsors as indispensable persons. *See, e.g.*, Dkts. 175 at 6; 177 at 15-16; 179 at 14-15; 206 at 14. Others do not identify any indispensable persons by name, but argue that certain unidentified "fiduciaries" are indispensable. *See, e.g.*, Dkts. 171 pp. 8-9; 173 at 7-8; 198 at 7-8. Because Defendants have failed to demonstrate that any necessary parties are absent, the Court denies the motions to dismiss to the extent that they are based on a failure to join any indispensable parties.

### 1. *Contribution*

Certain Defendants argue that AEUH, AEUB, their principals, and BWC are necessary parties because, in the event of a hypothetical judgment against Defendants, those entities will owe Defendants contribution. Dkts. 177 at 15; 206 at 14-15. These Defendants seem to suggest that, for purposes of Rule 19, any potential contributor is a "necessary" party. But Defendants do not cite (and the Court is not aware of) any authority holding as much. To the contrary, tortfeasors who are subject to joint liability are not automatically deemed "necessary" parties for purposes of Rule 19(a). *See Pasco Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496, 505 (7th Cir. 1980) ("tort-feasors with claims for indemnity or contribution are not even necessary parties under Rule 19(a) let alone indispensable parties under Rule 19(b)"); *see also Florian v. Sequa Corp.*, No. 98 C 7459, 2002 WL 31844985, at *5 (N.D. Ill. Dec. 18, 2002) ("the prospect of later litigation is not in itself sufficient to make the [third-parties] necessary parties . . . There is no prejudice to defendants because they can sue the [third-parties] for contribution"). Accordingly, the Court finds that the potential that any third parties may ultimately be liable to Defendants for contribution does not, in itself, render them "necessary" parties under Rule 19(a).

### 2. *Other Harmful Actors*

Next, several Defendants argue there are various actors who harmed the AEU Plan and the Participating Plans to a greater extent than Defendants harmed them, and that this fact makes them necessary parties under Rule 19. *See, e.g.*, Dkt. 175 at 5. For example, certain Defendants claim that they, too, were "victims of the same

abuse and mismanagement" perpetrated by the AEU Plan's fiduciaries. *Id*. But just because a plaintiff *may* choose to sue certain tortfeasors does not mean that it is *required* to do so. *See Rhone-Poulenc, Inc. v. Int'l Ins. Co.*, 71 F.3d 1299, 1301-02 (7th Cir. 1995) ("A victim of wrongdoing is not generally required to sue all the wrongdoers. Certainly not in a tort case, where the rule of joint and several liability reigns; and not in a contract case either"). That other absent actors may have harmed the AEU Plan and the Participating Plans does not make them "necessary" for purposes of Rule 19.

### 3. *Other Absent Persons*

Finally, certain Defendants argue that the AEU Plan, AEUB, BWC, the Participating Plans, and the employers-sponsors of the Participating Plans must be joined because they were parties to the contracts that form the basis of the IF's claims for breach of contract. *See, e.g.*, Dkts. 175 at 5-6; 179 at 14. As for AEU Plan and the Participating Plans, this argument is nonsensical: the IF is the receiver for those entities, so joining them as defendants to this litigation would require those entities, in essence, to sue themselves.

As to the AEUB, BWC, and the Participating Plans' employer-sponsors, the IF alleges that each Defendant "contracted with the AEU Plan through AEUB and BWC acting agents and authorized representatives of the AEU Plan" or with its "Participating Plan clients through each Participating Plan's employer-sponsor acting as agent and authorized representative of the Participating Plan" to serve as an insurance producer or broker for the AEU Plan and the Participating Plans,

respectively. TAC ¶¶ 199-200. Certain Defendants argue that AEUB and BWC, as the agents of the Receivership Entities as it relates to the alleged agreements, must be joined. Dkts. 175 at 5-6; 179 at 14-15. The Defendants are correct that, in a breach of contract claim, the contracting party is ordinarily considered a necessary party for purposes of Rule 19. *See Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 484 (7th Cir. 2001); *see also Elmhurst Consulting, LLC v. Gibson*, 219 F.R.D. 125, 127 (N.D. Ill. 2003) ("When the absent party is a party to the contract at issue in the claim, the Seventh Circuit has held that the party is a necessary one"). But under Illinois law, "[u]nless otherwise agreed, a person making or purporting to make a contract with another as *agent* for a disclosed principal does not become a party to the contract." *See Gateway Erectors Div. of Imoco-Gateway Corp. v. Lutheran Gen. Hosp.*, 430 N.E.2d 20, 23 (Ill. App. Ct. 1981) (emphasis added) (quoting Restatement (Second) of Agency § 320 (1958))); *see also* Restatement (Third) of Agency § 6.01 (2006) (same). Here the IF clearly alleges that the AEUB, BWC, and the Participating Plans' employer-sponsors were not *contracting parties* to the alleged agreement, but instead acted as *agents* for the AEU Plan when contracting with Defendants. TAC ¶ 199-200. Because they were agents and not parties to the alleged agreements, AEUB and AWC cannot be deemed necessary parties under Rule 19(a).

In conclusion, the Court finds that the IF has not failed to join any "necessary" party under Rule 19(a) and thus need not decide whether any absent party is "indispensable" under Rule 19(b). Accordingly, Defendants' motions to dismiss are

denied to the extent they are based on the IF's supposed failure to join any indispensable parties.

## G.    Breach of Contract

Count I of the TAC alleges breach of contract against all Defendants. TAC ¶¶ 198-203. The IF alleges that the Defendants contracted with the AEU Plan and their Participating Plan clients, and that Defendants breached these contracts through various actions and inactions, as described in greater detail below. *Id.* ¶¶ 199-201.

### 1.    *Failure to State a Claim*

To state a claim for breach of contract under Illinois law, a plaintiff must allege: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 996 (N.D. Ill. 2011) (citing *Van Der Molen v. Wash. Mut. Fin., Inc.*, 835 N.E.2d 61, 69 (Ill. App. Ct. 2005)). Under Illinois law, "a plaintiff seeking relief for breach of an oral contract bears the burden to both plead and prove the essential terms of the agreement sued on; that is, the offer made and its acceptance." *Hytel Grp., Inc. v. W.L. Gore & Assocs., Inc.*, 2004 WL 524440, *4 (N.D. Ill. 2004) (citing *Richco Plastic Co. v. IMS Co.*, 681 N.E.2d 56 (Ill. App. Ct. 1997)). "As with any contract, the offer 'must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered are reasonably certain.' " *Id.* (quoting *Rose v. Mavrakis*, 799 N.E.2d 469 (Ill. App. Ct. 2003)). All Defendants argue that the IF

fails to plead at least one of the necessary elements for a breach of contract claim. Dkts. 161 at 7-9; 167 at 2-6; 171 at 6-7; 173 at 5-6; 175 at 9-10; 177 at 10-11; 179 at 5-10; 181 at 4-7; 184 at 7-8; 195 at 9-10; 198 at 5-6; 206 at 9-10; 217 at 4-7; 244 at 2-5.

Before turning to the merits of Defendants' arguments, the Court will briefly summarize the facts relating to the IF's claim for breach of contract as alleged in the TAC. The IF alleges that each Defendant entered into an oral or implied-in-fact contract with the AEU Plan to serve as an insurance producer and broker for the AEU Plan. *Id.* ¶¶ 121-24, 198-99. Under these contracts, each Defendant marketed the AEU Plan, solicited sponsoring employers and their Participating Plans to use the AEU Plan as their health benefits plan, and enrolled and sometimes renewed enrollment of Participating Plans in the AEU Plan. *Id.* ¶¶ 120, 124. The AEU Plan's agent, BWC, paid each Defendant fees or commissions for successfully enrolling or renewing the enrollment of Participating Plans. *Id.* ¶ 126.

Each Defendant also entered into oral or implied-in-fact contract with each of its Participating Plan clients to serve as an insurance broker for the Participating Plans. *Id.* ¶ 128-31, 198, 200. Under these contracts, each Defendant identified and procured a health benefit program for its Participating Plan clients and enrolled them in the AEU Plan. The IF also alleges that Defendants were contractually obligated to the AEU Plan and the Participating Plans to understand how the AEU Plan was structured, understand what its "legal requirements" were, ensure that the AEU Plan was financially sound and appropriate for each Participating Plan and advise if it was

not, and to ensure that contributions were handled properly and segregated to avoid commingling, risk sharing, and the collective payment of claims. *Id.* ¶¶ 120, 125, 132, 141.

Per their contracts, each Defendant was also required to deliver certain documents to its Participating Plan clients for signature, ensure that required documentation was completed and submitted to the AEU Plan before accepting contributions from Participating Plans, and market the AEU Plan according to the Plan's underwriting standards. *Id.* ¶ 131. Defendants' contractual duties to their Participating Plan clients also included, for example, instructing them about the AEU Plan's structure and legal requirements, sharing material facts that could affect the transaction, and informing the clients if they were unable to procure an appropriate plan as requested. *Id.* ¶¶ 132, 137, 140.

The IF alleges numerous breaches of these agreements, including failure to (1) understand the AEU Plan's structure and legal requirements and communicate those to the Participating Plans (*id.* ¶¶ 143, 145-147, 156, 157, 161, 168-171, 182-83); (2) deliver required documents for signature and ensure that the documents were submitted before accepting contributions (*id.* ¶¶ 144, 148-151, 154, 157-58, 160-166, 171); (3) market and sell the AEU Plan in accordance with its underwriting standards (*id.* ¶¶ 187-190); (4) appropriately market the AEU Plan (*id.* ¶¶ 159-160, 166, 192); (5) ensure that the AEU Plan was financially sound and appropriate for each Participating Plan client (*id.* ¶¶ 163-66, 176, 184-86, 191-96); and (6) ensure that client funds were handled properly (*id.* ¶¶ 164-67, 171-78, 184).

As explained above, at this stage of the proceedings, a plaintiff is only required to set forth sufficient facts to place the defendant on notice of the claims; it is not required to prove its case. *See Am. Nurses' Ass'n v. Illinois*, 783 F.2d 716, 727 (7th Cir. 1986) ("[A] complaint is not required to allege all, or any, of the facts logically entailed by the claim . . . A plaintiff does not have to plead evidence . . . [A] complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing"). Under the liberal system of notice pleading envisioned by Rule 8 of the Federal Rules of Civil Procedure, "complaints need not contain elaborate factual recitations. They are supposed to be succinct . . . At this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (cleaned up), *cert. denied*, 516 U.S. 1159 (1996).

With these principles in mind, the Court holds that the IF has sufficiently stated a claim for breach of an oral contract between the Receivership Entities and Defendants. The IF has at least generally alleged the existence of contractual agreements (*see generally* TAC ¶¶ 121-144), Defendants' breaches of those agreements (*see generally id.* ¶¶ 143-190), and damages resulting from those breaches (*see, e.g., id.* ¶¶ 16, 152, 154, 202, 203). The Federal Rules do not require a plaintiff to allege specific facts that "establish" each element of a claim for relief. Rather, a complaint need only inform a defendant of the claims against him by concisely narrating the incident or incidents in question. The TAC provides adequate

notice to Defendants of the nature of the IF's breach of contract claim, even though it may not contain precise factual allegations. It is not necessary at this stage that the IF plead specific facts regarding the exact date the contracts were entered into, or the particulars of the alleged terms. Using the "imagination" test outlined *supra*, the Court can hypothesize facts consistent with the TAC that would make out a claim for relief. *See Sanjuan*, 40 F.3d at 251. Thus, the IF identifies a contractual relationship between Defendants and the AEU Plan and the Participating Plans, and claims that Defendants' actions and inactions, as described above, demonstrate breaches of those relationships. Because it does not appear beyond all doubt that the IF cannot prove a set of facts to support its claim in Count I, the Court cannot dismiss the claim.

### 2. *Assurance's Additional Evidence*

Defendant Assurance argues that the IF's claim for breach of contract against it should be dismissed because Assurance had "no further involvement in any aspect of the AEU program at issue in this case after September 14, 2016,"[4] and states that the TAC accuses Defendants of wrongdoing only from April to June 2017. Dkt. 161 at 8-9 (citing TAC ¶¶ 148-49). Assurance attaches to its motion a letter purporting to terminate BWC's "business relationship with Assurance" in September 2016. Dkt. 161-1. Although this letter, taken at face value, seems to suggest that BWC and Assurance no longer did business after September 2016, several months before the alleged inactions that gave rise to the IF's claim for breach of contract (*see* TAC ¶¶ 148-49), it is not properly before the Court and must be disregarded.

---

[4] The TAC does not allege that the "AEU program" was a contracting party. The Court assumes, for purposes of this argument, that Assurance is referring to the AEU Plan.

As discussed above, in deciding a motion to dismiss under Rule 12(b)(6), a district court may only consider extraneous documents not attached to a complaint only if the moving party shows that the documents are "referred to in the plaintiff's complaint" and are "'central to his claim." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). Assurance has not met that standard here. Accordingly, the Court must disregard the letter at this stage. Further, for the reasons discussed in Section III.C.2 above, the Court declines to convert Assurance's motion to dismiss into a motion for summary judgment.

### 3. *Third-Party Beneficiaries*

The IF pleads in the alternative that each Defendant entered into an oral or implied-in-fact contract with AEUB and BWC "to serve as an insurance producer and broker under which the AEU Plan was an intended, direct third-party beneficiary" and that the intent of these contracts "was for each Defendant to serve as a producer and broker for the AEU Plan and influence the Participating Plans to enroll in the AEU Plan as their health benefit plan." TAC ¶ 122. Thus, the IF alleges, "the contracts between Defendants and AEUB and BWC were intended to directly benefit the AEU Plan." *Id.* Several Defendants argue that the IF cannot state a claim that the Receivership Entities were third-party beneficiaries to any contracts. *See* Dkts. 171 at 6-7; 173 at 6; 179 at 8-10; 181 at 7; 184 at 7; 198 at 6; 217 at 8-9; 244 at 3.

Illinois does not recognize third-party beneficiary claims "unless the beneficiary is identified or the third-party benefit is clearly intended by the contracting parties." *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803,

820 (7th Cir. 2018) (citing *L.K. Comstock & Co. v. Morse/UBM Joint Venture*, 505 N.E.2d 1253, 1257 (Ill. App. Ct. 1987)). Conversely, there is a "strong presumption" under Illinois law "that parties intend a contract to apply solely to themselves" for enforcement purposes. *Bank of Am., N.A. v. Bassman FBT, LLC*, 981 N.E.2d 1, 11 (Ill. App. Ct. 2012); *see also Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 924 (Ill. App. Ct. 2009) ("It must appear from the language of the contract that the contract was made for the direct, not merely incidental, benefit of the third person"). This strong presumption "can only be overcome by a showing that the language and circumstances of the contract manifest an affirmative intent by the parties to benefit the third party." *Estate of Willis v. Kiferbaum Const. Corp.*, 830 N.E.2d 636, 642-43 (Ill. App. Ct. 2005) (citing *Bates & Rogers Constr. Corp. v. Greeley & Hansen*, 486 N.E.2d 902 (Ill. 1985)).

Although its allegations regarding third-party beneficiary status are thin, the Court finds that the IF has put forth enough facts that, taken as true, demonstrate that it is entitled to relief. At this stage, the IF need not *prove* the existence of an oral contract between AEUB, BWC, and Defendants in which the Receivership Entities were intended, third-party beneficiaries. Although the IF may have a difficult road ahead (especially given that the alleged contract is oral and Illinois law requires that the contracting clearly "clearly intend" a third-party beneficiary, *see Cmty. Bank of Trenton*, 887 F.3d at 820), whether third-party beneficiary status existed is a factual one to be resolved at a future stage of the litigation after the parties have had the benefit of discovery. *See In re Chicago Flood Litig.*, No. 93 C 1214, 1993 WL 239041,

at *9 (N.D. Ill. June 28, 1993) ("Because a determination of third-party beneficiary status must be based upon a consideration of the contract *and all the surrounding circumstances*, dismissal of American Home's third-party beneficiary claim at this early stage would be improvident"). In short, although the IF's allegations related to the AEU Plan's status are sparse, and although the Court does not have the benefit of reviewing any written contract that would demonstrate the intent of the parties to the alleged contract, the Court is satisfied that the IF has put forth enough facts, taken as true, to put the Defendants on notice as to the claims against them under a third-party beneficiary theory.

### H. Negligence

Next, the IF brings a claim for negligence against each Defendant. TAC ¶¶ 204-208. The IF alleges that Defendants "owed duties of reasonable care, good faith, and ordinary diligence . . . to the AEU Plan and to the Participating Plans it placed in the AEU" and that it breached those duties through various actions and inactions, as described in greater detail below. *Id.* ¶¶ 205-206. The IF further alleges that, as a result of Defendants' breaches, the Receivership Entities suffered damages in the form of (1) the unpaid claims of each Participating Plan that the Defendants placed with the AEU Plan, and (2) the fees and commissions Defendants were paid in association with the Participating Plans. *Id.* ¶ 207.

Defendants attack IF's negligence allegations as "threadbare" or "speculative and conclusory" and argue that the IF has failed to properly allege a claim for negligence under Illinois law. *See, e.g.*, Dkt. 179 at 10. In addition, several Defendants

argue that the economic loss doctrine bars the IF's negligence claim.

### 1. *Failure to State a Claim*

Several Defendants move to dismiss the IF's negligence claim for failure to state a claim under Rule 12(b)(6). Dkts. 161 at 6; 171 at 6-7; 173 at 6-7; 175 at 10-12; 179 at 10-11; 181 at 4-5; 184 at 8-11; 195 at 10-11, 13; 198 at 6-7; 206 at 11-12; 217 at 11-12; 244 at 7-8. To state a claim for negligence under Illinois law, "the plaintiff must establish that the defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff incurred injuries proximately caused by the breach." *Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 441 (7th Cir. 2009) (quoting *Espinoza v. Elgin, Joliet & E. Ry. Co.*, 649 N.E.2d 1323, 1326 (Ill. 1995)).

First, several Defendants argue that the IF has failed to allege a direct relationship between Defendants and the AEU Plan or the Participating Plans that would give rise to a duty of care. *See, e.g.*, Dkts. 171 at 5-6; 173 at 6-7; 175 at 10-11; 184 at 8-9. Under Illinois law, "[t]he existence of a duty depends upon whether defendant and plaintiff stand in such a relationship to one another that the law imposes upon defendant an obligation of reasonable conduct for the benefit of plaintiffs." *Gallagher Corp. v. Russ*, 721 N.E.2d 605, 610 (Ill App. Ct. 1999), *as modified on denial of reh'g* (Nov. 24, 1999), *as modified on denial of reh'g* (Dec. 23, 1999). To state a claim for negligence, plaintiff must "allege the existence of a relationship between themselves and the defendant that would give rise" to a duty of care. *Id.*

44

As this Court recognized in related litigation, the Illinois Supreme Court has "long held that every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Receivership Mgmt., Inc. v. AEU Holdings, LLC*, No. 18 C 8167, 2019 WL 4189466, at *17 (N.D. Ill. Sept. 4, 2019) (Lefkow, J.) (quoting *Skaperdas v. Country Cas. Ins. Co.*, 28 N.E.3d 747, 754 (Ill. 2015)). This duty of ordinary care "does not impose a universal set of requirements, but instead takes the shape of the particular context" and "can include responsibility for accurately communicating information." *Vertex Refining, NV, LLC v. Nat'l Union Fire Ins. Co.*, No. 16-cv-3498, 2017 WL 977000, at *6 (N.D. Ill. Mar. 14, 2017) (applying Illinois law). Illinois courts have also found a duty of care based on the principle of "affirmative undertaking," meaning that, in particular situations, "a person who begins a service for another must exercise reasonable care in performing it to avoid injury to the beneficiary of the undertaking." *Skaperdas*, 28 N.E.3d at 756.

The IF alleges that the AEU Plan, through AEUB and BWC, retained Defendants to market, recruit, enroll, and renew the enrollment of the Participating Plans in the AEU Plan and that the Participating Plans and their employer-sponsors retained Defendants to "locate and identify an appropriate health plan and make sure the plan was properly in place." TAC ¶ 120. The IF further alleges that AEU Plan and the Participating Plans' retention of the Defendants for these purposes created a duty for the Defendants to: (1) know and understand how the AEU Plan worked:

(2) instruct the Participating Plan about the AEU Plan's requirements; (3) ensure the Participating Plans received, completed, and submitted required documentation; (4) ensure the AEU was marketed and sold "in accordance with its underwriting standards;" (5) ensure the AEU Plan was "financially sound" and advise the Participating Plans if it was not; and (6) ensure that contributions were handled properly. *Id*.

The Courts finds that these allegations are sufficient to establish that Defendants owed a duty of care to the Receivership Entities. The IF has adequately alleged that the Defendants, as brokers for the Receivership Entities, had an ordinary duty of care to avoid foreseeable injuries to those entities. *Skaperdas*, 28 N.E.3d at 756. Further, in Illinois, "a particular burden" is placed "on an insurance broker to exercise competence and skill in rendering services." *Lake Cnty. Grading Co. of Libertyville, Inc. v. Great Lakes Agency, Inc.*, 589 N.E.2d 1128, 1132 (Ill. App. Ct. 1992). Consequently, "[t]he broker must inform the insured of all material facts within the broker's knowledge that may affect the transaction or the subject matter of the relationship." *Id*. As a result, "whether due to common knowledge or unequal knowledge, a broker in Illinois has a duty to inform an insured of material information in its possession." *AYH Holdings, Inc. v. Avreco, Inc.*, 826 N.E.2d 1111, 1130–31 (Ill. App. Ct. 2005).

Other Defendants argue that, even if a relationship existed between Defendants and the Receivership Entities that would give rise to a duty of care, the IF's negligence claim still fails because it has not properly alleged the remaining

elements of a negligence claim under Illinois law: breach, causation, and injury. *See, e.g.*, Dkt. 184 at 8-9. The TAC, however, clearly alleges breaches of Defendants' duty of care (*see, e.g.* TAC ¶¶ 142-197, 201) and identifies damages from those breaches (*see, e.g.*, *id.* ¶¶ 16, 152, 154, 202, 203) for which Defendants' negligence was the proximate cause (*see, e.g.*, *id.* ¶¶ 152, 154-59, 162-67, 172-78, 183-86, 197). Accordingly, the Court finds that the IF has adequately stated a claim for negligence under Illinois law.

### 2. *Economic Loss Doctrine*

Next, several Defendants argue that the economic loss doctrine bars the IF's negligence claims. *See* Dkts. 171 at 9-10; 173 at 8; 175 at 11-12; 177 at 12-13; 179 at 10-11; 181 at 8-9; 184 at 10-11; 195 at 10-11; 206 at 11-12. Under the economic loss doctrine, "a plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial transaction is generally limited to any remedies it may have under a contract and cannot recover in tort." *Receivership Mgmt.*, 2019 WL 4189466, at \*17 (citing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 450-51 (Ill. 1982)). In determining whether the economic loss doctrine bars a tort claim, "the key question is whether the defendant's duty arose by operation of contract or existed independent of the contract." *Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 567 (7th Cir. 2012). Although the economic loss doctrine has its roots in products liability law, the Illinois Supreme Court has since extended it to a variety of contexts, including the furnishing of services. *See Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 513 (Ill. 1994).

The Illinois Supreme Court has identified several exceptions to the doctrine:

> (1) where the plaintiff sustained damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions.

*In re Chicago Flood Litig.*, 680 N.E.2d 265, 275 (Ill. 1997) (emphasis and internal citations removed). A fourth exception "provides that where a service professional has duties to his client that arise independently of his contractual duties, the client may sue in tort for breach of those independent duties." *Mercola v. Abdou*, 223 F. Supp. 3d 720, 729 (N.D. Ill. 2016) (citing *Congregation of the Passion*, 636 N.E.2d at 514).

Courts examining the application of this exception to the economic loss doctrine have emphasized that the existence of an extracontractual duty "depends on whether a defendant's work produces an intangible, purely informational product, and whether the work requires a degree of discretion and independence, or knowledge and expertise, that cannot be memorialized in a contract and studied by the parties." *Receivership Mgmt.*, 2019 WL 4189466, at *19 (quoting *Haimberg v. R & M Aviation, Inc.*, 5 Fed. App'x 543, 549 (7th Cir. 2001) (nonprecedential disposition)) (cleaned up). Applying those principles, Illinois courts have held the exception applies to insurance brokers. *Kanter v. Deitelbaum*, 648 N.E.2d 1137, 1140 (Ill. App. Ct. 1995). Courts have also held that the exception extends to financial advisers. *See Mercola*, 223 F. Supp. 3d at 730.

The Court holds that this so-called "fourth exception" applies to this case. The parties do not dispute that, as brokers for the AEU Plan and the Participating Plans, Defendants provided purely intangible services that required a high degree of knowledge and expertise. Accordingly, the Court finds that the economic loss doctrine does not the IF's negligence claim. *See Kanter v. Deitelbaum*, 648 N.E.2d 1137, 1140 (Ill. App. Ct. 1995) (insurance broker's duty "in performing insurance brokerage services was not solely defined by contract, but rather was extracontractual in nature . . . As such, the economic loss doctrine does not bar plaintiffs' recovery of their economic damages under a tort theory for [broker's] negligent breach") (cleaned up).

## I. Section 2-2201 Claim

Count III of the TAC alleges that the Defendants based in Illinois (Corso, Assurance, BBG, CGI, FSC, the HFA Defendants, HRB, HUB, MBA, Trendsetters, and Williams-Manny) (collectively, the "Illinois Defendants") violated 735 ILCS 5/2-2201 ("Section 2-2201"). TAC ¶¶ 209-214. Section 2-2201(a) requires "[a]n insurance producer, registered firm, and limited insurance representative" to "exercise ordinary care and skill in renewing, procuring, binding, or placing the coverage requested by the insured or proposed insured." 735 ILCS 5/2-2201(a). The IF alleges that each Illinois Defendant "failed to exercise ordinary care and skill in renewing, procuring, binding, or placing the coverage requested for its participating plan clients" and is thus "liable for its negligence" under the statute. TAC ¶¶ 203-204.

### 1. "Conclusory" Allegations

Several of the Illinois Defendants argue that the IF's allegations in Count III

are "conclusory" and, as a result, fail to put them on fair notice as to the nature of the claims against them. *See* Dkts. 161 at 9-10; 171 at 7-8; 175 at 12; 177 at 11; 179 at 11; 181 at 7-8; 184 at 10-11; 206 at 10. These Defendants contend the IF has merely "parroted" the statute with "threadbare" allegations and has not adequately pleaded breach of the statutory duties set forth in Section 2-2201. *Id.*

In determining whether a plaintiff has stated a claim for relief, the Court must read the entire complaint and assess its plausibility as a whole. *See Scott v. City of Chicago,* 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice . . . is determined by looking at the complaint as a whole"); *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) ("the complaint *taken as a whole* must establish a nonnegligible probability that the claim is valid") (emphasis added). Here, Count III expressly incorporates all of the factual allegations of the TAC. *See* TAC ¶ 209, incorporating ¶¶ 1-197. These allegations include an extensive recitation of facts alleging breaches of the duty of care that the IF alleges existed between Defendants and the Receivership Entities. *Id.* ¶¶ 142-190. Many of the IF's allegations specifically refer to renewing, procuring, binding, or placing coverage, *see, e.g., id.* ¶¶ 115, 129, 131, 133, 140, 156, 159, 166, 178, 197. The Court is thus satisfied that the IF's factual allegations, when taken together and read in the context of the TAC as a whole, "give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). At the pleading stage, that is all that a plaintiff is required to do. *Id.*

Along the same lines, Defendant MBA argues Count III's allegations against

"each [Illinois] Defendant" are not specific enough to state a claim. Dkt. 195 p. 11. As discussed above, however, this type of "group pleading" is permissible. *See supra* Sec. III.D.; *see also Marposs,* 262 F. Supp. 3d at 617-18 ("group pleading" does not violate Rule 8 *per se* if the complaint provides sufficient detail to put the defendant on notice).

MBA also argues the IF fails to allege the violation of Section 2-2201 (1) proximately caused damages to the Participating Plans or that (2) the Participating Plans suffered any damage at all. Dkt. 195 at 11. Reading the complaint as a whole, however, the IF has clearly alleged both elements. *See* TAC ¶ 207 ("As a direct and proximate results of each Defendant's breaches of duty . . . the AEU Plan was caused to incur claims obligations and related expenses, and to incur and pay improper and unnecessary fees and commissions to Defendants"). The Court finds that these allegations are sufficient to state a claim under Section 2-2201.

### 2. *Insurance Producers*

Defendant HUB argues that the IF has failed to allege that the Illinois Defendants are "insurance producers" under Section 2-2201. Dkt. 179 at 12. The term "insurance producer" is construed broadly under Section 2-2201 and includes insurance "brokers." *See Skaperdas v. Cnty. Cas. Ins. Co.*, 28 N.E.3d 747, 754 (Ill. 2015) ("The undefined term 'insurance producer' in section 2–2201 may reasonably be understood as referring to either an agent or a broker, or both"). The IF explicitly alleges that each defendant is both an insurance producer and broker. *See, e.g.*, TAC ¶ 121 ("Each Defendant entered into [a] . . . contract . . . to serve as an insurance

producer and broker"). The Court thus finds that the IF has adequately alleged that Defendants are "insurance producers" for purposes of its Section 2-2201 claim.

### 3. *Insurance Coverage*

Finally, Defendant HUB argues that the IF "fails to plead that the AEU Plan was even insurance coverage[.]" Dkt. 179 at 12. The IF alleges that the AEU Plan is an MEWA as defined by ERISA. TAC ¶ 2 (citing 29 U.S.C. § 1002(40) (an MEWA is "an employee welfare benefit plan or any other arrangement . . . which is established or maintained for the purpose of offering or providing [various benefits, including health benefits] to the employees of two or more employers")). HUB argues that an MEWA cannot be considered an "insurance plan" and is instead an "employee benefits plan." Dkt. 179 at 12. The question is thus whether the IF has adequately pleaded that the AEU Plan, as an MEWA, can be considered insurance "coverage" for purposes of a Section 2-2201 claim.

The IF argues that it has adequately pleaded that the AEU Plan, through its constituent Participating Plans, provided "coverage" as that term is used in Section 2-2201. The Court agrees. The TAC contains numerous allegations that the AEU Plan and the Participating Plans provided insurance coverage. *See* TAC ¶ 3 (Participating Plans "pooled funds and shared insurance risks" through the AEU Plan); ¶ 4 ("AEU Plan was transacting insurance in each of the States where the Participating Plans were located"); ¶ 114 (Participating Plans "shared risks in several ways, including by the payment of each other's claims from commingled funds"); ¶ 124 (Participating Plans used AEU Plan "as their health benefit plan"); ¶ 159 (Participating Plans

assumed AEU Plan "insured against the risks that resulted in their losses"); ¶ 167 (use of AEU Plan "resulted in the improper commingling of funds [and] risk sharing among the individual participating Plans"); ¶¶ 176-77 (commingling resulted in collective payment of claims); ¶ 186 (Participating Plans were not self-funded). The Court, as it must at this stage, accepts these allegations as true. *See Iqbal*, 556 U.S. at 678-79. Based on these allegations, the Court finds that the IF has adequately alleged that the AEU Plan, as an MEWA, was an insurer providing "coverage" to the Participating Plans as that term is used in Section 2-2201.

## J.     Section 121-4 Claim

The Illinois Insurance Code makes it "unlawful for any insurer to transact insurance business in [Illinois] . . . without a certificate of authority from the Director [of Insurance]." 215 ILCS 5/121-2. Only the Illinois Director of Insurance, however, may enforce this provision. 215 ILCS 5/121-5. But that does not leave victims of unauthorized insurers without remedy. Another provision of the statute, 215 ILCS 5/121-4 ("Section 121-4"), provides in relevant part:

> The failure of an insurer transacting insurance business in this State to obtain a certificate of authority does not impair the validity of any act or contract of that insurer . . . If any such unauthorized insurer fails to pay any claim or loss within the provisions of such an insurance contract, any person who assisted or in any manner aided directly or indirectly in the procurement of the insurance contract shall be liable to the insured for the full amount of the claim or loss as provided in that insurance contract.

215 ILCS 5/121-4.

In Count IV, the TAC alleges that the Illinois Defendants violated Section 121-

53

4 because (1) the AEU Plan was an unauthorized insurer; (2) it entered into insurance contracts with the Participating Plans as insureds; (3) the Illinois Defendants assisted or aided in the procurement of the insurance contracts; and (4) the AEU Plan failed to pay claims and losses as provided in such insurance contracts. TAC ¶¶ 218, 220-22. Thus, according to the IF, the Illinois Defendants are liable to the AEU Plan and the Participating plans for damages under Section 121-4.

The Illinois Defendants argue, however, that Section 121-4 does not create a private right of action. Dkts. 161 at 10-11, 171 at 7, 175 at 12, 177 at 11-12, 179 at 12-13, 181 at 9, 184 at 11-12, 206 at 20-11. The Court agrees. Section 121-4 specifies "remedies available to victims, but [does] not impose substantive limitations on the conduct of insurers." *Daniels v. Bursey*, 313 F. Supp. 2d 790, 804 (N.D. Ill. 2004). In other words, the statutes specifies the remedies available when an unauthorized insurer breaches a contract—that is to say, when it "fails to pay any claim or loss within the provisions of . . . an insurance contract" (215 ILCS 5/121-4)—but does not create a private right of action. *See Hamilton v. Safeway Ins. Co.*, 432 N.E.2d 996, 999 (Ill. App. Ct. 1982) (Illinois statute permitting the Director of Insurance to take action against a company engaging in improper claims practices implies there is no private right of action for such practices).

The IF would have the Court take a "plain language" approach and find that Section 121-4's provision that any "person" who assisted an unauthorized insurer in procuring insurance "shall be liable to the insured." 215 ILCS 5/121-4. It is not as clear as the IF suggests, however, that this language creates a private right of action

54

as opposed to some other sort of remedy. *See Daniels*, 313 F. Supp. 2d at 804 (Section 121-4 specifies "who can be sued and the remedies available when an insurance company fails to pay a claim, but a plaintiff relying on [Section 121-4] sues the insurance company for failing to pay a claim, not for violating the Illinois Insurance Code"). In support, the IF relies on *dicta* in *Gen. Ins. Co. of Am. v. Robert B. McManus, Inc.*, 650 N.E.2d 1080 (Ill. App. Ct. 1995), in which the Illinois Appellate Court, interpreting Section 121-4, noted that "[c]learly, [the broker] would be liable to [the insured] for the claims or loss that would have been covered by the [insurance] policy." *Id.* at 1082. The court did not, however, hold that Section 121-4 created a private right of action. Absent a clear indication from an Illinois court that the relevant provisions of the Illinois Insurance Code allow private citizens, as opposed to the Illinois Director of Insurance, to bring suit under the statute, the Court declines to read a private cause of action into the language of the statute where none clearly exists. *See Brooks v. Midas-Int'l Corp.*, 361 N.E.2d 815, 822 (Ill. App. Ct. 1977) (had the Illinois legislature "intended to grant a private right of action . . . [it] would have explicitly done so"). Accordingly, the IF's claim for violation of Section 121-4 is dismissed with prejudice. *See Smith-Bey v. Hosp. Adm'r,* 841 F.2d 751, 758 (7th Cir. 1988) (dismissal with prejudice appropriate where the deficiencies in a pleading cannot be cured by amendment).

### K.     Strict Liability – West Virginia Defendants

In Count V, the IF brings a strict liability claim against the Defendants based

in West Virginia: IIS and Ferrell (collectively, the "West Virginia Defendants").[5] TAC

¶¶ 224-33. The IF alleges that the West Virginia Defendants violated W. Va. Code

§ 33-12C-4(d) ("Section 33-12C-4(d)"), which provides that:

> If the nonadmitted insurer fails to pay a claim or loss
> within the provisions of the insurance contract and the
> laws of this state, a person who assisted or in any manner
> aided directly or indirectly in the procurement of the
> insurance contract, shall be liable to the insured for the full
> amount under the provisions of the insurance contract.

W. Va. Code § 33-12C-4(d).[6] More specifically, the IF alleges that the West Virginia

Defendants violated Section 33-12C-4(d) because (1) the AEU Plan operated in West

Virginia as a nonadmitted insurer, (2) the AEU Plan entered into insurance contracts

with the Participating Plans as insureds, the (3) the West Virginia Defendants

"assisted" or "aided" the AEU Plan "in the procurement of the insurance contract[s],"

and (4) the AEU Plan failed to pay claims for losses as provided in those contracts.

TAC ¶ 226-28, 230-32.

IIS argues that the IF has failed to state a claim for violation of Section 33-

12C-4(d) because the IF has not properly alleged that the AEU Plan was an "insurer"

for purposes of the statute. Dkt. 244 at 9-11. IIS contends that the AEU Plan is not

an "insurer" because it is "not an entity engaged in the business of making contracts

of insurance[,]" but is instead a "group of insurance contracts." *Id.* at 10. Because the

---

[5] Ferrell has not appeared in this action and has not filed a motion to dismiss this, or any, count.

[6] The Court notes that the parties have not cited, nor has the Court discovered through its own research, any published state or federal decision ever interpreting Section 13-12C-4(d). Although the Court cannot say whether IIS's characterization of the statute as "little known" is correct, the Court agrees with IIS' statement that there is "virtually no case law interpreting [Section 13-12C-4(d).]" Dkt. 251 at 6.

AEU Plan is not an "insurer" under the statute, IIS argues, the AEU Plan cannot be considered an "unauthorized" insurer and IIS cannot be held strictly liable for its alleged assistance in aiding the AEU Plan to procure non-paying insurance contracts. *Id*.

The IF alleges that the AEU Plan was a "nonadmitted insurer" that "transacted insurance in West Virginia." TAC ¶ 227. At the same time, however, the IF alleges that the AEU Plan "constituted or included an insurance contract." *Id*. ¶ 230. IIS argues, in essence, that the IF cannot have it both ways; that is, the AEU Plan cannot be both an "insurer" and an "insurance contract" for purposes of Section 33-12c-4(d). Dkt. 244 at 10-11.

The Court agrees that the IF's allegations with respect to Section 33-12c-4(d) appear to suggest that the AEU Plan is simultaneously an insurer and an insurance contract. The statute at issue defines "insurer" as "any person . . . [or] any other legal entity engaged in the business of making contracts of insurance[.]" W. Va. Code § 33-12C-3(m). How then, can the AEU Plan be both an "insurer" "making contracts of insurance" (*see* TAC ¶ 228) and a "contract of insurance" at the same time? The IF makes no attempt to explain this logical inconsistency in its response brief. *See generally* Dkt. 250 at 4-8. Because the IF has alleged that the AEU Plan is both an "insurer" and a "contract of insurance" under Section 13-12C-4(d), application of the statute to the West Virginia Defendants would lead to an absurd result. Accordingly, the Court finds that the IF has failed to state a claim in Count V against the West

Virginia Defendants and dismisses it without prejudice and with leave to replead.[7]

### L.    Strict Liability – North Carolina Defendants

In Count VI, the IF brings a strict liability claim against the defendants allegedly based in North Carolina: HFA and Krogulski (collectively, the "HFA Defendants"). TAC ¶¶ 234-44. North Carolina law prohibits any "person" in the state from aiding in placing insurance coverage with any "insurer not authorized to transact business" in North Carolina:

> No person shall in this State act as agent for any insurer not authorized to transact business in this State, or negotiate for or place or aid in placing insurance coverage in this State for another with any such insurer.

N.C. Gen. Stat. § 58-28-45(a) ("Section 58-28-45"). The statute further provides any "person" who violates the statute shall be strictly liable for any losses or unpaid claims:

> In addition to any other penalties or remedies provided by law, any person who violates this section shall be strictly liable for any losses or unpaid claims if an unauthorized insurer fails to pay in full or in part any claim or loss within the provisions of any insurance contract issued by or on behalf of the unauthorized insurer in violation of this Article. The liability imposed by this subsection shall be joint and several if more than one person violates this section.

*Id.* § 58-28-45(l).

The IF alleges that the HFA Defendants, who are based in North Carolina, violated Section 58-28-45 because they "aided in placing insurance coverage" in North

---

[7] Because the IF has failed to adequately allege that the West Virginia defendants violated Section 33-12c-4(d), the Court need not address IIS's arguments that "any state law claims concerning the AEU Plan are preempted by ERISA." Dkt. 244 at 12.

Carolina with the AEU Plan, which was not an authorized insurer in North Carolina. TAC ¶¶ 238, 240. The IF further alleges that HFA is an "unincorporated entity located in North Carolina" and that Krogulski, its sole owner, is a resident and citizen of North Carolina who is licensed as an insurance broker in both Illinois and North Carolina. TAC ¶ 59. Because the AEU Plan "failed to pay claims and losses due," the IF argues, "the HFA Defendants are strictly liable to their Participating Plan clients for the full amount of their unpaid claims and losses." *Id.* ¶¶ 243-44.

The HFA Defendants argue that the IF's Section 58-28-45 claim fails because the IF has not alleged that the HFA Defendants transacted business in North Carolina. Dkt. 175 at 12-13. They also contend that they "have been located in, or [are] citizens of, Illinois," not North Carolina Dkt. 175 at 13. The IF, however, has clearly alleged that the HFA Defendants "negotiated for and/or placed or aided in placing insurance coverage with the AEU Plan *in North Carolina* for its Participating Plan clients." TAC ¶ 240. As it must on a motion to dismiss, the Court accepts these allegations as true. *See al-Kidd*, 563 U.S. at 742.

In support of their argument that they never transacted business in North Carolina, the HFA Defendants have submitted an affidavit from Krogulski in which he states, among other things, that he "never transacted business in North Carolina relative to BWC or the AEU Plan." Affidavit of M. Krogulski, Dkt. 175-3 ¶ 5. The IF argues that that dismissal based on this evidence is premature, as the affidavit is not properly before the Court. The Court agrees. *See supra*, Section III.C.2, III.G.2. Discovery in this case very well may show that the HFA Defendants never transacted

business in North Carolina, but at the motion to dismiss stage, the Court must accept the IF's allegations as true and may not rely on extraneous evidence. Accordingly, the HFA Defendants' motion to dismiss Count VI for failure to state a claim is denied.

## IV.    CONCLUSION

For all the reasons stated above, the Court GRANTS in part and DENIES in part the pending motions to dismiss. The motions to dismiss are DENIED with respect to the IF's claims for breach of contract (Count I), negligence (Count II), violation of 215 ILCS §5/2-2201 (Count III), and strict liability under N.C. Gen. Stat. § 58-28-45 (Count VI). The IF's claim against the Illinois Defendants for strict liability under 215 ILCS § 5-121/4 (Count IV) is dismissed with prejudice, as that statute does not create a private right of action. The IF's claim for strict liability against the West Virginia defendants under W. Va. Code § 33-12C-4(d) (Count V) is dismissed without prejudice for failure to state a claim. Should the IF believe it can cure the deficiencies addressed in this order as to Count V, it is granted leave to file a Fourth Amended Complaint within 30 days of this order. If a Fourth Amended Complaint is not filed within 30 days, the dismissal of Count V will automatically convert to a dismissal with prejudice.

SO ORDERED in No. 19-cv-01385.

Date: March 31, 2021

JOHN F. KNESS
United States District Judge

60